Rebekah Schultheiss
rebekah@millardoffices.com
(121199, Oregon)
Law Offices of Rebekah Millard, LLC
P.O. Box 7582
Springfield, OR 97475
(707) 227-2401

Timothy R. Snowball
tsnowball@libertyjusticecenter.org
(317379, California)
Kathryn Cosgrove
kcosgrove@libertyjusticecenter.org
(312079, California)
PARENTS Initiative of the Liberty Justice Center
1629 K Street N.W., Suite 300
Washington, D.C. 20006
(312) 637-2280

UNITED STATES DISTRICT

COURT DISTRICT OF OREGON

PORTLAND DIVISION

| Allison Roberts, | Case No. _____ |
|---|---|
| *Plaintiff,* | |
| v. | **COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF** |
| PORTLAND PUBLIC SCHOOLS; CHANDRA WILSON-COOPER; and DEANNE FROEHLICH | |
| *Defendants.* | |

## Introduction

Defendants Portland Public Schools, Director Chandra Wilson-Cooper, and Principal Deanne Froehlich took offense at Plaintiff Allison Roberts's speech opposing the introduction of "trans" ideology at her children's school. Allison spoke out because she wanted to raise her children according to her Christian faith. Defendants' motivation in issuing trespass orders, vilifying Allison publicly, and launching an official investigation was to silence Allison.

These actions violated the First Amendment. Allison has the right to criticize the policies and actions of Defendants, even if they find her views offensive. Additionally, Defendants' characterization of Allison's speech as "harassment" under overbroad and vague policies constitutes an independent violation of the First Amendment. Finally, Defendants violated the First and Fourteenth Amendments by failing to give Allison notice of the introduction of "trans" ideology to her children and subjecting them to a secret gender transition policy.

For these reasons, Allison seeks declaratory, and preliminary and permanent injunctive relief, to end Defendants' ongoing actions violating her constitutional rights.

## Jurisdiction and Venue

1. This action arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983 (deprivation of federal civil rights), 28 U.S.C. §§ 2201–2202 (declaratory relief), and Federal Rule of Civil Procedure 65 (permanent injunctive relief).

2. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal questions), and 28 U.S.C. § 1343 (deprivation of federal civil rights).

3. Venue is proper in the United States District Court for the District of Oregon under 28 U.S.C. § 1391(b)(1) and § 1391(b)(2), because all Defendants are residents of Oregon, and a substantial part of the events giving rise to this action occurred in this judicial district.

## Parties

4. Plaintiff Allison Roberts is the mother of two Portland Public Schools students. Allison is currently under a one-year trespass order for Meriwether Lewis Elementary School, a subsidiary of Portland Public Schools, and under threat of a permanent trespass order for all

Portland Public School property, because of her speech criticizing district officials and policies.

5. Defendant Portland Public Schools (the District) is a pre-kindergarten–12th grade school district in Portland, Oregon. With more than 42,000 students in 81 schools, it is one of the largest school districts in the Pacific Northwest. The District is responsible for creating and enforcing policies, including those Defendants are using to chill Allison's speech. The District's address for service is 501 N Dixon St, Portland, OR 97227.

6. Defendant Chandra Wilson-Cooper, sued in her official capacity, is the Senior Director of Schools for the District. In this role, she is responsible for enforcing District policies, including those Defendants are using to chill Allison's speech. Her address for service is 501 N Dixon St, Portland, OR 97227.

7. Defendant Deanne Froehlich, sued in her official capacity, is the Principal of Meriwether Lewis Elementary School. In this role, she is responsible for enforcing District policies, including those Defendants are using to chill Allison's speech. Her address for service is 4401 SE Evergreen St, Portland, OR 97206.

## Factual Allegations

### A. Allison Roberts: Mother, liberal, and Christian.

8.  Allison was born and raised in Portland, Oregon, and has lived there all her life. She loves Portland and decided to raise her family in the city.

9.  During the 2025–2026 school year, Allison's youngest children— C1 and C2—both attended Meriwether Lewis Elementary School (Lewis Elementary), which is located within the District and subject to its jurisdiction.

10.  C1, age 11, has since graduated to Sellwood Middle School, which is also located within the District and subject to its jurisdiction.

11.  C2, age 9, still attends Lewis Elementary and is entering 4th grade.

12.  Having had a positive experience when their older son attended Lewis Elementary, Allison and her husband intentionally built their new home only blocks from the campus so that C1 and C2 could attend there, too.

13.  One of her favorite things about living in Portland is being immersed in the city's vibrant multi-cultural and gay community.

14.    However, Allison is also a Christian and takes issue with schools promoting what she considers controversial "trans" ideology that teaches children to question their sex and the way God made them.

15.    Similarly, for religious reasons, Allison opposes the school's focus on racial identity politics, which she feels breeds racial divisiveness and undermines shared American values.

## B. Lewis Elementary introduces controversial "trans" ideology on campus.

16.    In the past, Lewis Elementary painted school benches with a gay "pride flag" motif.

17.    However, without any consultation with the larger school community, Lewis Elementary changed the pride flag benches from their traditional configuration by adding the "Intersex-Inclusive Progress Pride Flag." **Ex. A**; *see also* LGBTQ+ Pride Flags, Human Rights Campaign.[1]

18.    In addition to the traditional rainbow pattern associated with gay pride, this flag—created by British political activist Valentino Vecchietti—includes colors and designs concerning individuals who are

---

[1] https://www.hrc.org/resources/lgbtq-pride-flags (last visited: Aug 11, 2026).

Verified Complaint of Allison Roberts – Page 5

"trans" and advocates an "intersectional" philosophy.



19.    Allison considers this flag an overtly political symbol that promotes values contradictory to her Christian faith.

20.    As Allison was contemplating how to respond to the painted benches, C1 brought home an "identity flower" assignment. **Ex. B**.

21.    As part of this assignment, C1 was required to identify his "gender" for his teacher and classmates.



22.   Allison received no notice of this "identity flower" assignment, or ability to opt C1 out from it.

23.   This assignment led Allison to wonder what else may have been involved with this assignment, and what else was being taught at Lewis Elementary on gender issues without parents' knowledge or participation.

24.   Concerned with the introduction of "trans" ideology through the introduction of the "Intersex-Inclusive Progress Pride Flag" and gender-based assignments at her children's school, Allison approached the

principal of Lewis Elementary, Deanne Froehlich, and requested a meeting with her.

## C. Lewis Elementary staff dismiss Allison's concerns.

25.    When Allison arrived for the requested meeting with Froehlich, there were three additional school staff members present in the principal's office.

26.    This included C1's teacher, but also C2's teacher, and a school counselor.

27.    Allison had neither requested the presence of these other individuals nor been notified in advance of their attendance.

28.    Allison began the conversation by posing several questions to C1's teacher, including asking what exactly was meant by "gender" on C1's "identity flower" assignment, whether C1 and his classmates had been given other assignments regarding "gender," and why this lesson had gone forward without parental notice.

29.    Initially, C1's teacher was evasive, and avoided answering Allison's questions.

30.    Eventually, C1's teacher got visibly agitated, raised her voice, and shouted at Allison, "Why do you need to know?!"

31. Allison responded that C1 was her child and that, as a parent, she had a right to know if the school was teaching C1 material advancing a controversial political agenda that conflicted with her Christian values.

32. Allison never received a satisfactory answer from the Lewis Elementary officials present at the meeting.

33. Before the meeting concluded, Allison requested that the school counselor provide her with a copy of any instructional material related to the "identity flower" assignment, as well as any other material touching upon gender ideology to which her children had been exposed.

34. The materials she was eventually provided were alarming and revealed that the "identity flower" assignment was supplied by GLSEN, a group "[c]hampioning LGBTQ+ issues in K-12 education."[2]

35. In reviewing the materials provided, Allison discovered that C1's "identity flower" assignment was part of a larger lesson encouraging children to question their sex and gender identity.

36. As part of this lesson, C1 was told: "You may identify as a girl or a boy, " and "maybe you feel like a girl or a boy today, but later that

---

[2] https://glisten.org/

word doesn't feel right," and "you tell us and the rest of the world what feels right to you." **Ex. C**, at 2.

37. C1 was also instructed that it is possible to identify as neither gender.

38. C1 was told to answer the question, "what gender identity term feels right to you today," and to consider "how you are expressing your gender today."

39. C1 was then required to present his answers to the entire class.

40. Also included in the materials was information on other gender and identity-based political lesson plans to which C1 and C2 had been exposed without Allison's knowledge or consent. **Ex. D**.

**D. Allison's first letter to the Lewis community.**

41. By January 2026, with her concerns unaddressed by Froehlich or the other officials at Lewis Elementary, and unable to voice her concerns to other parents through the PTA, Allison decided to direct her efforts to the larger community. So, she wrote a letter expressing her views. **Ex. E**.

42.     Titled "Open Letter to Lewis Parent Body," the letter laments Allison's frustrated attempts to take her concerns to the Lewis Elementary administration.

43.     Allison also expressed specific criticism of Froehlich's decision to repaint the benches with the "Intersex-Inclusive Progress Pride Flag" without any input from the larger Lewis Elementary community.

44.     She concluded the letter by clarifying her concerns over the introduction of "trans" ideology to children at Lewis Elementary.

45.     In Allison's own words: "If we truly support the gay community, we should not blur the line between same sex attraction and medicalized identity…Why is a hotly contested subject being presented as instructional?"

46.     Allison and a companion she hired to help stood on the public sidewalk outside the front of the school distributing the letter.

47.     No students were approached, no school property was involved, and no one was pressured to accept or read the material.

**E. Defendants target Allison for selective enforcement of the District's "harassment" policies and Froehlich targets Allison's speech.**

48. On February 4, 2026, while picking up C1 and C2 from school, Allison saw another parent named Olivia she thought she recognized from the PTA.

49. Allison stopped to speak with her, and they had a respectful conversation about a recent situation involving the PTA.

50. Allison told Olivia that she enjoyed the conversation, that they should continue it tomorrow, and asked how Olivia took her coffee.

51. The next day during school pickup, February 5, Allison arrived with coffee for herself and Olivia.

52. However, there was another man present, who Olivia introduced as her husband, John.

53. As Olivia and Allison resumed their conversation, John interrupted to ask Allison whether she voted for Donald Trump.

54. When Allison responded that she had voted for Donald Trump, and that she had almost been assaulted for wearing a Trump hat, John began repeatedly yelling, "White people are disgusting!" at the top of his lungs.

55. Several children on the playground nearby reacted in shock to John's yelling.

56. In frustration, Allison told John that he was the one being racist and cussed at him before leaving the area.

57. The entire interaction lasted no longer than five minutes.

58. The next morning on February 6, 2026, Allison and her family woke up to the sound of the police knocking at their door.

59. In front of her neighbors, the police served Allison with a one-year trespass order from the Lewis Elementary campus. **Ex. F**.

60. The trespass order, signed by Froehlich under the seal of the District, stated that it was being issued because of the "safety concern" that occurred the previous day.

61. The order threatened that failure "to adhere to this trespass order may result in law enforcement involvement."

62. To Allison's knowledge, John was not similarly cited, despite his own involvement in the heated conversation.

63. The trespass order claimed that Allison engaged in "harmful, unlawful and/or disruptive behavior," but did not provide any specific details of the incident.

64.   The trespass order further claimed it was premised on Allison allegedly "threatening and intimidating members of the school community" which Allison denies occurred.

65.   Only after Allison repeatedly followed up with the District did Chandra Wilson-Cooper, Senior Director of Schools, send an email with details of the alleged "harassment" for which the trespass order was issued.

66.   But Wilson-Cooper's email contains nothing but generalized statements, with no specific names, dates, times, or details about the alleged incidents, while nonetheless citing the violation of District policies 7.40.010-AD(I)(A)1-2, and 1.80.021-P (the Harassment Policy). **Ex. G**.

67.   Allison also vehemently denies the allegations in this email.

68.   Nevertheless, not only was Allison served with the trespass order, but Froehlich sent an email out to the entire Lewis community accusing Allison of engaging in "harassment, intimidation, and threatening behavior" as part of a pattern of "animus and harassment targeting vulnerable members of our community" for the "past several months." **Ex. H**.

69. Froehlich also stated that Allison's "hate speech" had been the subject of an ongoing investigation by the Civil Rights and Racial Equity and Social Justice teams at the District.

70. No one at the District had ever contacted Allison about an alleged pattern of harassment or an investigation.

71. Froehlich went on to state that if other parents felt "unsafe" as a result of Allison's "hate speech," or saw Allison on campus, they should let the staff know immediately.

**F. Allison continues her effort to opt her children out of curricula that contradicts her Christian faith.**

72. Not until February 8, 2026, following this series of events, did the District purport to give Allison the opportunity to opt C1 out of the remaining 2025–2026 school year lessons concerning "trans" ideology which contradict her sincerely held Christian beliefs. **Ex. I**.

73. However, Allison has received no such notice or opportunity regarding C1 or C2 for the upcoming school year.

74. The District's reticence stems from its own policies prohibiting such disclosure to parents.

75. The District's policy dealing with lessons on sex and gender, 4.30.061-AD, Title XI (the Nondisclosure Policy), states that the Office

of Teaching and Learning must "deny all requests for prior notification and/or student exemptions from "LGBTQ2SIA+ affirming lessons." **Ex. N**, at 9, 14–15.

76.   This Nondisclosure Policy is currently displayed on the District's website. *See* Transgender, Nonbinary and Gender Expansive Students, Administrative Directive 4.30.061-AD, Portland Pub. Schs. (rev. June 2023).[3]

77.   The Nondisclosure Policy further states that not only will the District not require parental consent for a student to "socially transition" at school, but that it will "balance" federal requirements with students requests to keep their new gender identities at school a secret from their parents.

78.   It also instructs staff to "[a]sk students and staff what pronouns they use" in order to honor these preferences.

79.   These parts of the Nondisclosure Policy are also currently displayed on the District's website. *See* Transgender, Nonbinary and

---

[3] Archived at
https://web.archive.org/web/20260716151432/https://resources.finalsite.net/images/v1751565184/ppsnet/na98du51apq5desurgf8/430061-ADTransgenderNonbinaryandGenderExpansiveStudents.pdf (July 16, 2026).

Gender Expansive Students, Administrative Directive 4.30.061-AD, Portland Pub. Schs. (rev. June 2023).[4]

80.    In addition to the "identity flower" assignment C1 was compelled to participate in, Allison has learned of a host of other gender and identity-based political curricula Lewis Elementary requires, but that contradict Allison's Christian beliefs.

81.    This includes lessons regarding the use "of puberty blockers for transgender youth." **Ex. I**.

## G. Allison's appeal, her second letter to the Lewis community, and Froehlich's continued targeting of Allison's speech.

82.    Following several inquiries regarding the appeal process for the trespass order, Allison submitted her appeal according to the information she received.

83.    The "hearing" on the appeal was a 30-minute long Zoom call before a panel of school employees, specifically two janitors and a basketball coach.

---

[4] Archived at
https://web.archive.org/web/20260716151432/https://resources.finalsite.net/images/v1751565184/ppsnet/na98du51apq5desurgf8/430061-ADTransgenderNonbinaryandGenderExpansiveStudents.pdf (July 16, 2026).

84.    One janitor was walking down the school halls actively dumping garbage cans during the "hearing."

85.    No witnesses of the alleged harassment were called, and no specifics of the alleged harassment were provided.

86.    Two days later Allison was informed via emailed letter from the District that it had affirmed its decision. **Ex. J**.

87.    As a result of the trespass order and the rejected appeal, Allison was not allowed to attend C1's graduation to middle school, a major milestone in his life.

88.    Desperate for help, Allison wrote a second letter to the Lewis Elementary community and passed it out with help from a family friend on the sidewalk outside the school, this time offered via QR code. **Ex. K**.

89.    Again, no students were approached, no school property was involved, and no one was required to accept or read the material.

90.    In the second letter, Allison directly challenged Froehlich and the District on what she considered "falsehoods, reputational distortions, institutional punishments, and public insinuations."

91.    In the letter, Allison lamented that she had never been contacted by anyone from the District regarding alleged concerns and

challenged them to produce evidence supporting the allegations of "harassment."

92.    Shortly thereafter, Froehlich sent another email out to the Lewis community regarding Allison's speech. **Ex. L**.

93.    In this email, Froehlich specifically targeted Allison's speech in her second letter as "antithetical to everything we stand for as a community."

94.    According to Froehlich, because "Lewis is an inclusive school that respects the diversity of all who call it home," when "harm" or "fear" occurs there must be a response to "disrupt the harm."

## H. The District threatens to trespass Allison from all District property, permanently.

95.    Three days later, Allison received an email from the District about her having "distributed a letter." The District's email threatened that if Allison did not cease the so-called "harassment" present in her letter, it might permanently extend the previous trespass order to apply to all District property. **Ex. M**.

96.    The email stated that Allison's second letter amounted to "continued harassment which was the basis for your trespass on February 6, 2026." *Id.*

97.    Again, relying on the District's Harassment Policy, **Ex. G**, this threat relied on Allison's alleged "harassment" as defined by the District and encompassed both Allison's written and verbal speech.

98.    Due to the District's most recent threat, and her fear of suffering a permanent trespass, Allison has ceased distributing her letter and ended her other speech activities regarding Lewis, the District's decision to introduce "trans" ideology on campus, Froehlich, and the people and the events that led to her one-year trespass.

99.    Unclear on exactly what falls within the definition of "harassment," her only communication with the District since its most recent threat was again seeking clarification on the scope of the Harassment Policy and what is specifically prohibited.

100.  This request for additional information has gone unanswered.

**I. Allegations applicable to requests for equitable relief.**

101.  Allison continues to keep her silence under the threat of the District's current trespass threat, the threat of future public statements attacking her, and renewed investigation by the District.

102.  This includes silencing herself from written speech that may or may not supply grounds for her permanent trespass from all District property.

Verified Complaint of Allison Roberts – Page 20

103. This includes silencing herself from oral or leafletting activities from public sidewalks that may or may not supply grounds for her permanent trespass from all District property.

104. This includes silencing herself from petitioning Defendants for a redress of grievances that may or may not supply grounds for her permanent trespass from all District property.

105. The District has still not explained to Allison what is or is not prohibited by the District's Harassment Policy, and whether future speech would put her in a position for the Defendants to further punish her.

106. Also unclear is what subject matter the District believes falls within the District's Harassment Policy.

107. As a result, Allison continues to keep her silence.

108. Finally, as Allison's children continue to attend schools within the District, she continues to be injured by the Nondisclosure Policy that both prohibits her from receiving notice and opt-out opportunity from curricula that violates her religious practices, and prohibits her from potentially receiving mental health information about her children's attempts to "socially transition" at school.

109.  As long as these policies remain in effect, Allison's rights to the free exercise of her Christian faith and ability to direct the upbringing of her children are burdened.

110.  There is no adequate remedy at law for these continuing and imminent constitutional injuries.

111.  Therefore, preliminary and permanent injunctive relief is appropriate, as Allison is suffering and, absent relief, will continue to suffer irreparable harm to her First Amendment rights without this Court's intervention.

## Causes of Action

### Count I

### Retaliation for the exercise of First Amendment freedoms
### First Amendment
### (42 U.S.C. § 1983)

112.  Plaintiff re-alleges and incorporates by reference all allegations contained in the previous paragraphs.

113.  Under the First Amendment, incorporated by the Fourteenth Amendment, the government is prohibited from interfering with the freedom of speech, the press, and the petitioning rights of citizens.

114.  The freedom of speech includes the spoken and written word, including letters and pamphlets, and peaceful picketing and leafletting.

115. The right to petition the government includes the act of communicating with government officials through written correspondence.

116. Additionally, the historical practice of pamphleteering implicates the right to petition, and the freedom of the press.

117. Sidewalks and public streets are an archetype of a traditional public forum used for public assembly and debate, at which First Amendment protections are at their zenith.

118. Further, speech on public issues rests on the highest rung of the hierarchy of First Amendment protection.

119. Criticizing the manner of operating a school system, and the officials who operate it, concerns issues of general public interest, and these concerns may be expressed on public sidewalks adjacent to school grounds.

120. A plaintiff will prevail in a First Amendment retaliation suit if they can "show that (1) he or she was engaged in a constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in

the defendant's conduct." *Dickinson v. Trump*, 174 F.4th 634, 637 (9th Cir. 2026).

121. Here, Defendants retaliated against Allison for the protected exercise of her First Amendment freedoms.

122. First, Allison was engaged in constitutionally protected activities, namely, expressing her opposition to Lewis Elementary and District policies concerning the introduction of "trans" ideology to children, and criticizing public officials' reactions to her complaints, through oral and written opposition and leafletting activities.

123. Second, Defendants' actions in issuing Allison a one-year trespass order from Lewis Elementary, selectively enforcing their own "harassment" policy, vilifying her, attacking her character in public communications to the community, making her the subject of an official District investigation, and threatening her with a potentially permanent trespass order from all District property, would chill a person of ordinary firmness from continuing to engage in the protected activities.

124. Lastly, Allison's disfavored speech and petition activities opposing the introduction of "trans" ideology to children was a substantial or motivating factor in Defendants' retaliatory conduct.

125. Allison's activity took the form of opposing the policies orally to Froehlich and other officials at Lewis Elementary, writing an initial letter criticizing the policies, and making said letter available to members of the public on the sidewalk outside the school.

126. Defendants then took the opportunity to selectively enforce the District's Harassment Policy by issuing Allison a one-year trespass order following what can fairly be described as a mutually heated encounter with another parent who repeatedly screamed "White people are disgusting!" in the presence of children.

127. That other parent was not trespassed or investigated, and Froehlich did not disparage his character to the community.

128. Froehlich's own stated motivation for sending her community-wide email was to make members of the community feel safe from "hate speech."

129. Froehlich also stated in her first email that Allison was the subject of an official investigation by Civil Rights and Racial Equity and Social Justice teams.

130. After Allison wrote her second letter challenging Froehlich and the District over the "trans" policies and their retaliation against her, and again made her speech available to the public on the sidewalk outside Lewis Elementary, Defendants' response escalated.

131. Froehlich not only specifically targeted Allison's speech in her second public email to the community as "antithetical to everything we stand for as a community," but the District issued Allison a potentially permanent trespass threat for all District property.

132. For these reasons, Allison seeks a declaratory judgment that the Defendants' retaliatory conduct was unconstitutional, and she seeks preliminary and permanent injunctive relief.

## Count II

### Chill on the exercise of First Amendment freedoms
### First Amendment
### (42 U.S.C. § 1983)

133.  Plaintiff re-alleges and incorporates by reference all allegations contained in the previous paragraphs.

134.  Viewpoint discrimination is established where a regulation of speech cannot be "justified without reference to the content of the regulated speech," or when the government adopted or enforced the regulation "because of disagreement with the message the speech conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (tidied) (quoting *Ward v. Rock Against Racism*, 491 U. S. 781 (1989)).

135.  Additionally, because "a principal purpose of the traditional public fora is the free exchange of ideas, speakers cannot be excluded from a public forum unless the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985).

136.  Here, Defendants' current threat to potentially permanently trespass Allison from all District property is both viewpoint

discrimination and burdens her right to express herself in a traditional public forum, both of which are subject to strict constitutional scrutiny.

137.   Defendants cannot justify their current trespass threat, and the likelihood that Allison will again be publicly vilified or subjected to a District investigation, without relying on the content of her views and speech.

138.   But for the content of Allison's speech in her second letter, which Defendants' second trespass threat specifically references, Allison would—like any other member of the District community—be allowed to write, speak, and share her views with others as she wished.

139.   But because Defendants disfavor Allison's views as "hate speech" or as otherwise objectionable, they continue to silence her.

140.   Additionally, Defendants' second trespass threat, premised directly on Allison's second letter and her distribution of it on the sidewalk outside Lewis Elementary, represents an attempt to exclude her from protected expression in a public forum.

141.   In fact, Defendants' current trespass threat makes specific mention of both Allison's second letter and her act of "distributing" it.

142. Additionally, even a seemingly viewpoint neutral policy becomes a First Amendment violation when it is enforced in a discriminatory manner.

143. Here, in her first email to the Lewis Elementary community disparaging Allison, Froehlich stated that Allison's speech constituted "harassment, intimidation, and threatening behavior" as part of a pattern of "animus and harassment targeting vulnerable members of our community."

144. Even more to the point was Froehlich labeling Allison's protected speech as "hate speech."

145. In Froehlich's second email to the Lewis Elementary community, she identified Allison's speech as "antithetical to everything we stand for as a community."

146. The other parent in the alleged harassment incident who repeatedly yelled "white people are disgusting" in the presence of children, suffered no consequences under the Harassment Policy.

147. No trespass order was issued to John, no public disparagement took place, and no investigation was launched.

148. Further, there has been no subsequent allegation of harassment to justify the District's current trespass threat outside of Allison's second letter.

149. Accordingly, the District's Harassment Policy, while facially neutral, is nonetheless enforced in a discriminatory manner, based on the disfavored viewpoint of the speaker.

150. Finally, a government restriction is invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.

151. Relatedly, a regulation is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.

152. Here, the District's Harassment Policy defining "harassment" and "all forms of harassment" is substantially overbroad and unconstitutionally vague.

153. Not only does the Harassment Policy appear, through Defendants' enforcement actions, to encompass actual disruptive

activities on campus, but also purports to regulate protected oral and written expression including leafletting from public sidewalks.

154. The Harassment Policy is also void-for-vagueness, because the circular definition of "harassment" as "harassment" is effectively no definition at all, and provides no notice of what speech or conduct is prohibited.

155. To this day, Allison remains unaware of what specific speech or other activities the District deems "harassment," and out of fear of permanent trespass, has ceased all speech and petitioning efforts and activities related to the situation.

156. For these reasons, Allison seeks a declaratory judgment that the District's current trespass threat and Harassment Policy unconstitutionally chill her speech, and she seeks preliminary and permanent injunctive relief.

## Count III

### Burden on the free exercise of religion through Nondisclosure Policy First and Fourteenth Amendments (42 U.S.C. § 1983)

157. Plaintiff re-alleges and incorporates by reference all allegations contained in the previous paragraphs.

158. The Supreme Court has held unequivocally that a public school violates the First Amendment when it refuses to provide parents notice and an ability to opt their children out from lessons and assignments related to LGBTQIA+ issues. *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025).

159. While "[a] classroom environment that is welcoming to all students is something to be commended," the Supreme Court has made clear that "such an environment cannot be achieved through hostility toward the religious beliefs of students and their parents." *Id.* at 568.

160. The Supreme Court has specifically listed teachers asking students, "What pronouns fit you best?" as an example of an LGBTQIA+-related curriculum component that would require notification and opt-out opportunities. *Id.* at 534.

161. Additionally, both the Supreme Court, *Mirabelli v. Bonta*, 607 U.S. 492 (2026), and Ninth Circuit, *City of Huntington Beach v. Newsom*, No. 25-3826, 2026 U.S. App. LEXIS 17884 (9th Cir. June 18, 2026), recognize that secret gender transition policies in which officials offer to keep children's gender dysphoria a secret from their parents also violate the First Amendment's free exercise guarantee.

162. In the Ninth Circuit, a parent suffers such an injury just for being subject to the policy, even if their child has not attempted to socially transition.

163. Finally, under long-established precedent, parents—not the State—have primary authority with respect to "the upbringing and education of children." *Mirabelli*, 607 U.S. at 496–97 (quoting *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925); *see also Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923)).

164. Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state.

165. Here, the District's Nondisclosure Policy burdens Allison's First Amendment right to the free exercise of her Christian faith.

166. Allison believes that God created man and woman as two distinct sexes, and that contemporary "trans" and gender theories undermine this belief.

167. Yet, the District's Nondisclosure Policy refuses notice and the ability to opt out from such lessons, as the First Amendment and Supreme Court require.

168. The Nondisclosure Policy even requires children be asked about their pronouns, which the Court has specifically prohibited.

169. Additionally, the District's Nondisclosure Policy burdens Allison's Fourteenth Amendment right to direct the upbringing and education of her own children.

170. Finally, the District's Nondisclosure Policy offers children the chance to socially transition genders and keep this information from their parents.

171. This is also squarely at odds with First Amendment requirements and binding precedent at both the Supreme Court and Ninth Circuit.

172. This school year, under the Nondisclosure Policy, Allison has not been given notification rights, nor has the District agreed to allow her to opt her children out of curricula that violate her Christian faith.

173. She also remains subject to the secret transition portion of the Nondisclosure Policy for both C1 and C2.

174. For these reasons, Allison seeks a declaratory judgment that the District's Nondisclosure Policy unconstitutionally burdens her free exercise rights, and she seeks preliminary and permanent injunctive relief.

## Prayer for Relief

Allison Roberts respectfully requests this Court order the following relief:

## A. Preliminary Injunction

- A preliminary injunction against the Defendants ordering that they immediately cease enforcement of the District's Harassment Policy and Nondisclosure Policy against her, including refraining

from public statements denigrating her character, or pursuing any official or unofficial investigations against her.

## B. Declaratory Judgment

- Declaring that the Defendants' retaliation against her for her protected First Amendment activities was unconstitutional;

- Declaring that the Defendants' current trespass threat against her constitutes viewpoint discrimination under the First Amendment, and is unconstitutional;

- Declaring that the District's selective enforcement of its Harassment Policy unconstitutionally chills her speech;

- Declaring that the District's Harassment Policy is unconstitutionally overbroad and void-for-vagueness, and chills protected First Amendment activities, as-applied and facially;

- Declaring that the District's Nondisclosure Policy unconstitutionally burdens the free exercise of religion, and the parental right to direct the upbringing and education of children, as-applied and facially.

## C. Permanent Injunction

- A permanent injunction ordering that the Defendants, their officers, employees, agents, attorneys, and all others acting in concert with them, permanently cease from engaging in any of the activities the Court declares violate Allison's First and Fourteenth Amendment rights.

## D. Fees, Costs, and Other Relief

- A judgment awarding Allison Roberts her costs and attorneys' fees pursuant to 42 U.S.C. § 1988;

- Any and all further relief the Court deems just and proper.

Date: August 12, 2026

Respectfully Submitted,

Rebekah Schultheiss
Law Offices of Rebekah Millard, LLC
P.O. Box 7582
Springfield, OR 97475
rebekah@millardoffices.com
707-227-2401

*/s/TR Snowball*

Timothy R. Snowball*
Kathryn Cosgrove*
Counsel for Plaintiff
PARENTS Initiative of the

Verified Complaint of Allison Roberts – Page 37

Liberty Justice Center
1629 K Street N.W.
Suite 300
Washington, D.C. 20006
Ph.: 312-637-2280
tsnowball@libertyjusticecenter.org
kcosgrove@libertyjusticecenter.org


*Pro hac vice forthcoming

## Verification

I, Allison Roberts, declare as follows:

1.  I am Plaintiff in the present case, a citizen of the United States of America, and a resident of the State of Oregon.

2.  I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Verified Complaint, if called I would competently testify as to matters stated herein.

3.  I verify under penalties of perjury, under the laws of the United States, that the foregoing statements of which I have personal knowledge are true and correct.

Executed on: August 12, 2026

*Allison Roberts*

Allison Roberts

Verified Complaint of Allison Roberts – Page 39