# EXHIBIT A



# EXHIBIT B



# EXHIBIT C

**GLSEN**

# IDENTITY FLOWERS



### AGE/EXPERIENCE LEVEL
Grades 3-5.



### COMMON CORE STATE STANDARDS
English Language Arts - Reading-Literature, Writing, Speaking and Listening.



### MCREL STANDARDS (4TH EDITION)
■ Behavioral Studies: Understands that group and cultural differences contribute to human development, identity, and behavior.
■ Thinking and Reasoning: Effectively uses mental processes that are based on identifying similarities and differences.
■ Self-Regulation: Maintains a healthy self-concept.



### OVERVIEW
Teaching young people about major identifiers helps them to learn about their own unique identities, as well as the myriad identities in their classroom communities. This lesson supports each student's ability to empathize, connect, and collaborate with a diverse group of peers—skills that are of increasingly important in our multicultural, global society. In this lesson, students will explore their own identities and personal experiences with race, culture, ability, family structure, religion or spirituality, and gender identity and expression. After individual reflection and group discussion, students will create their own identity flowers, filling each petal with words, adjectives, and/or identity terms that describe them.



### OBJECTIVES
Students will reflect on their own identity in regards to group identities.
Students will analyze story book characters to determine fitting identity terms and adjectives.
Students will identify words, adjectives, and identity terms that describe themselves.
Students will discuss the importance of respecting people's identity terms and descriptive words.

*Note: This lesson is designed as an introduction and exposure to the concept of gender as an identity. While we've included language you can use to discuss gender identity and gender expression with your students, their ability to grasp these concepts will depend on their prior knowledge. Likewise, their deeper understanding will come from continued discussion and follow-up activities suggested at the end of this lesson.*



## THINGS TO PREP & TOOLS NEEDED

■ Choose picture books or story books with familiar characters to the students. This is a good opportunity to review your classroom library and shared stories for diversity. Find at least one copy of each book per group.

■ Print out one copy of the Identity Flower handout for each student in your class, and another copy for the group work activity.

■ Decide if you want to model the Identity Flower using yourself or a book character that is familiar to your students, and have some ideas for each petal/group identity ready.

■ (Optional) - Print or review GLSEN's gender visual and discussion guide for talking points around gender identity vs. expression.

■ Chart paper, markers, paper, pencils, Gender Terminology Handout, Identity Flower Handout



## TIME
40 minutes.

## PROCEDURE

1. (2 minutes) Opening: Begin the lesson by telling students, "Today we'll be talking about 'identity' and the many different pieces that fit together to shape our experiences and ultimately make us who we are." If you have a projector, display a blank Identity Flower handout or draw one on chart paper. Explain that each petal represents a different part of your identity.

2. (10 minutes) Talk through each of the petals with the students, and model adjectives, identity terms, and drawings that could go in each petal. Ask students if there are any petals/groups that they have questions about. Depending on your students' background knowledge, they may have questions about the "gender" petal. Use the Gender.
Terminology Handout to explain these two terms. 🧠 **Gender identity** and 🤸 **gender expression**.

   a. Tell students, "Gender identity is how you identify and see yourself. You may identify as a girl or a boy. If you don't feel like a boy or a girl, you might just identify as a person. Maybe none of these words feel like you today. Or maybe you feel like a girl or a boy today, but later that word doesn't seem to fit. It's your brain, and you tell us and the rest of the world what feels right to you."

      i. "Take a second to think about what gender identity term feels right to you today, if there is one." Pause to let students think.

      ii. "Gender expression is the way we show our gender. Just like how we make facial expressions when we're feeling happy or sad on the inside, we have gender expression to show our gender to other people. This can include the way that we talk, what toys we play with, the clothes and accessories we wear, the colors we like, our haircuts, and much more!"

 

 iii. "Take a second to think about how you are showing or expressing your gender today." Pause to let students think.

 iv. "You can represent your gender identity or expression in this petal using words, pictures, or even colors."

b. Fill in a copy of the Identity Flower for the students, using yourself or a familiar character. Here are some suggestions for inclusive and appropriate language for each of the petals:

 i. Family - This is a great opportunity to show positive representations of other family structures such as two moms, two dads, trans parents, single parents, foster and step families, grandparent-headed families, etc. and to steer away from the idea that the nuclear family can and should be the default family structure. Be sure these are represented in your model and in the characters that the students will explore in group work.

 ii. Race/Culture - Tell students that race is one way to group people, usually based on skin color, hair texture, and places, countries, or lands that your family (grandparents and great-grandparents and before!) came from. Culture is a way of living that is passed down in your family—including food you eat, beliefs you have, holidays you celebrate, languages you speak, and more! Using the model example will help students better understand this larger concept. For more information check out this Teaching Tolerance lesson.

 iii. Ability - Tell students that this part of identity has to do with to the different ways that people move or learn or communicate. Tell them, "Think about the tools that you need. Some people need glasses to see, a walker or wheelchair to get around, a computer or sign language to communicate, or a bumpy seat or movement break to help them learn."

 iv. Spirituality - It's important to explain that some people don't have a religion or spiritual sense, and may center, or focus on, being kind to others or ongoing learning about the world through other practices.

 v. Neighborhood - This can show a student's home or reflect restaurants or monuments that are close by. This is also an opportunity for students to talk about their commutes to school.

 vi. School - This can be symbols of your school or represent favorite subjects or celebrations.



**GENDER IDENTITY**
How you identify and see yourself.
Everyone gets to decide their gender identity for themselves.



**GENDER EXPRESSION**
The way that we talk, how we interact with others, our clothing, accessories, hairstyles, activities we enjoy, and much more!





3. (10 minutes) Group work: In partners or groups, students fill out an Identity Flower for a familiar character in a book. After students have worked together to complete an Identity Flower for the character, have students share as time allows. This can be done by partnering groups who finish first to share with each other. Here are some example books and characters:
   a. Jazz Jenning's *I am Jazz*
   b. Alex Gino's George
   c. Ami Polonsky's *Gracefully Grayson* (fifth grade)
   d. Taye Diggs' *Mixed Me!*
   e. Robert Coles' *The Story of Ruby Bridges*
   f. Mary Hoffman's *Amazing Grace*
   g. Celeste Shally's Since *We're Friends: An Autism Picture Book*
   h. Rukhsana Khan and Sophie Blackall's The Big Red Lollipop

4. (10 minutes) Individual practice: Tell students, "Thinking about these 'group identities' helps us to learn more about these characters' identities. Now we want to learn more about **your** identity. What groups feel right to you? What makes you special and unique?"
   a. Pass out individual Identity Flower handouts to students.
   b. Tell students that they can write words, names, or draw pictures or symbols for each of the petals in the Identity Flower. You may want to have students write in pencil, check with a teacher, and then add color.

5. (13 minutes) Closure: Invite students to show their Identity Flowers to the class, and to share a part of their identity that feels special to them. Be prepared for students to share aspects of their identity that may be new to you or the class, particularly around gender. Be sure to model affirming responses to identity aspects that students' share.
   a. Ask students, "What words or pictures did you use to show your gender identity or gender expression?" *Listen out for gender stereotypes, and be ready to follow this lesson with That's a (Gender) Stereotype!* For example, if students say, "I drew this flower in pink because I'm a girl" you can say, "That's a very detailed flower! Do all girls have to like flowers and pink?" or "That's interesting! We'll talk more about that later."
   b. "Which parts of your identity are you the most proud of?" "How would you feel if someone teased you for those parts of your identity, for being you?"
   c. "Who should get to fill out your identity flower, you or someone else? Could I go around and write whatever words or names on your identity flower that I want?" Follow up with, "That's right, you know your identity, who you are, what names and words you want to be called. When you call someone a name or tease them, it's like filling out their identity flower for them."
   d. "Do you think our class would be better if all of our flowers or all of our identities were the same? Why or why not?" To finish, tell students, "If all of our identity flowers were the same, it'd be like using only one color to draw with all of the time. We're lucky to have so many different identities in our class! Turn to the person next to you and give them a compliment about their flower."

 

## OPPORTUNITIES FOR DIFFERENTIATION

The individual work of creating the Identity Flower handout can be modified for students who need more support by working one-on-one with a teacher and being given stickers or pictures representing the student to place on the sign. Students who need a challenge can be asked to write a paragraph, book, or poem to accompany their Identity Flower handout or asked to compare their identity to the character from their group work.

## FOLLOW UP/EXTENSIONS

- Students can fill out GLSEN's "I Am" signs to have students continue to reflect on and share words, names, and identifiers that feel good to them.
- Read more books to help students explore identity themes: Try Todd Parr's "Be Who You Are", You Be You! Explaining Gender, Love & Family by Jonathan Branfman, and "Who are you?: the Kid's Guide to Gender Identity" by Brook Pessin-Whedbee.
- Dedicate a bulletin board to Student Identity and hang the Identity Flowers on the wall.
- Go to www.glsen.org/nncw for GLSEN's No Name-Calling Week and more lessons that put "Kindness in Action".
- Keep learning! Read GLSEN's Gender Terminology Discussion Guide and Pronoun Resource for Educators to learn more about gender-inclusive language.
- Find more lessons, activities, and resources in GLSEN's Elementary Toolkit: Ready, Set, Respect!

DID YOU PARTICIPATE IN THIS ACTIVITY? TELL US HOW IT WENT AND WHAT COULD HAVE BEEN BETTER! EMAIL US AT **EDUCATORS@GLSEN.ORG**.

 



## GENDER IDENTITY

How you identify and see yourself.
Everyone gets to decide their gender identity
for themselves.



## GENDER EXPRESSION

The way that we talk, how we interact with others,
our clothing, accessories, hairstyles, activities we
enjoy, and much more!

# _____'S IDENTITY FLOWER



MY FAMILY

NEIGHBORHOOD

GENDER

MY SCHOOL

ME

RACE/ CULTURE

SPIRITUALITY

ABILITY



# EXHIBIT D



# PPS Teaching Identity Guidance

## Why should we teach Identity?

Teaching children about identity can help them develop a sense of belonging, self-awareness, and confidence, which can impact their well-being and resilience. It can also help them learn to adapt to new situations, regulate their emotions and make friends with people who share their interests.



When I discover who I am, I'll be free!
– Ralph Ellison

## Where is Identity in Oregon Standards?

The 2024 Oregon Social Science Standards include four main domains; civics, geography, economics and history. The domains include four concepts to assist teachers and students in understanding the main ideas of each domain.

In Domain 1: Civics - one of the concepts is Identity, Roles and Responsibilities. Each grade level has specific standards regarding identity, both as an individual and as a member of the larger community.

## How do I teach Identity?

| Kinder - 1st | 2nd - 5th |
| --- | --- |
| Identity lessons are located in the first Social Studies Unit for each grade level.<br>Kinder: My Self & Family<br>1st Grade: My Self & Community | Identity lessons have been curated from Learning for Justice, GLSEN, Facing Ourselves & History, OER Project and Human Rights Campaign Foundation. You may already have your own lessons that you have created or curated to teach identity. |

## When do I teach Identity?

As a part of the Content Rotation, we have included time to teach Identity during Social Studies minutes. Identity lessons may also show up in SEL curriculum, Morning Meetings, Counseling, Health, ELA and Math.

| **Kinder - 1st** - Identity is integrated into the 1st Social Studies unit of the year. | **2nd - 5th** - Identity is taught the first week of school during the content rotation minutes. |
|---|---|

## Identity Learning Goals

- Students can recognize and develop an understanding of the components of a person's identity including but not limited to race, gender, family, ethnicity, culture, religion, ability, beliefs, personality traits and appearance.
- Students can articulate the difference between visible and invisible identity
- Students will develop positive social identities based on membership in multiple groups in society.
- Students will develop language and historical and cultural knowledge that affirm and accurately describe their membership in multiple identity groups.
- Students will recognize that multiple identities interact to create unique and complex individuals.
- Students will express pride, confidence and healthy self-esteem without denying the value and dignity of other people.
- Students will recognize traits of the dominant culture, their home culture and other cultures, and understand how they negotiate their own identity in multiple spaces.

## How do I learn more about teaching Identity?

| Digging Deep into the Social Justice Standards: Identity | Planning Period with PBS LearningMedia: Identity Matters |
|---|---|
| Who that am I? A philosophical inquiry | |

# LESSON PLAN SERIES

# Different Colors of Beauty

**Grade Level:** K-2, 3-5
**Topic:** Race & Ethnicity
**Subject:** Reading & Language Arts, Social Studies, SEL, Arts, ELL / ESL
**Social Justice Domain:** Identity

The overall goal of these lessons is to help students develop their racial or ethnic identities in a safe and open classroom environment. Each lesson capitalizes on a slightly different modality of learning. The lessons offer questions and conversation starters to help build understanding and community.

Because issues of skin color, race and racial identity can be complicated, each lesson offers additional guidance for teachers in a section on professional development. These sections will help you build a safe, open and accepting classroom and school community.

**Looking Closely at Ourselves**
Students paint self-portraits and use visual arts to begin exploring skin color.

**Looking at Race and Racial Identity Through Critical Literacy in Children's Books**
Students look critically at the literature in their school and classroom libraries and develop an understanding of racial stereotypes.

**Sharing Our Colors: Writing Poetry**
Students explore their own sense of racial identity by reading and writing poetry.

**Family Colors: Interviewing Our Families**
Students develop interviewing and reporting skills. They will talk to their families and develop a historical understanding of racial bias.

**Painting Beauty: Creating Self-Portraits**
Students apply and continue to develop a more nuanced understanding of skin color, race and beauty by painting and critiquing more advanced self-portraits.

**Reflection**
Students reflect on and celebrate the concepts they have developed and their growing sense of community. They set goals for themselves as community members and fighters of stereotypes and bias.

Reprinted with permission of **Teaching Tolerance,** a project of the Southern Poverty Law Center.
https://www.tolerance.org/classroom-resources/tolerance-lessons/different-colors-of-beauty

1

# LESSON ONE

## Looking Closely at Ourselves

In this lesson, students explore race and self-identity by creating self-portraits. The lesson aims to help students develop detailed observational skills and use these skills in relation to themselves and others. It also begins constructing a vocabulary that is crucial in helping build community and discuss some of the more challenging aspects of race and racial identity formation.

**Grade Level:** 3-5, 6-8, 9-12
**Topic:** Race & Ethnicity Bullying & Bias
**Subject:** Reading & Language Arts, Arts
**Social Justice Domain:** Identity

### Objectives

At the end of the lesson, students will understand the importance of self-reflection and how it helps us improve our observation, understanding, and communication with others in our community.

### Essential Questions

- How does looking closely at ourselves help us understand others?
- What are some ways we can make ourselves — and people around us — more comfortable when we are talking about challenging or confusing topics?

### Enduring Understandings

- Looking closely at ourselves can make us more sensitive to how we see and think about others, and heighten our awareness of our own and others' beauty.
- Talking about challenging or confusing topics requires sensitivity and thoughtfulness. Speakers should use respectful tones, be specific when offering feedback, and listen carefully to responses.

Reprinted with permission of **Teaching Tolerance,** a project of the Southern Poverty Law Center.
https://www.tolerance.org/classroom-resources/tolerance-lessons/different-colors-of-beauty

## 2nd - 5th Grade Identity Lessons

| Learning for Justice |
|---|
| Discovering My Identity |
| Different Colors of Beauty |
| Examining Identity & Assimilation |
| What's in a Name? |
| **GLSEN** |
| Identity Flower |
| Beauty is Skin Deep |
| I am Me: Talking About Identity |
| Human Rights Campaign Foundation |
| My Many Identities |
| **OER Project** |
| Who Am I? |
| **Facing History & Ourselves** |
| What's in a Name? |
| **Seesaw** |
| My Identity Poem |
| Totally Me |
| Thinking About Identity |
| My Identity Map |

*I need to get these ones to you yet (need asct + pswd)

# EXHIBIT E

# Open Letter to Lewis Parent Body

My name is Allison Roberts. I am a parent at Lewis Elementary. My children are ███████████ .

I did not set out to write a public letter. I asked for meetings. I asked for process. I asked for clarity. I asked for placement on the PTA agenda. I followed the channels I was told to follow and waited for a normal opportunity to speak as a parent among other parents.

That opportunity never came.

Instead, every conventional attempt I made to participate was stalled, redirected, or quietly neutralized. As this dragged on, I watched a narrative form about me before I was given a straightforward forum to speak for myself.

This letter exists because ordinary participation did not.

Before I address the substance, I want to be clear about who I am and why I am willing to put my name on this.

I am a Portland native from North Portland. I grew up here. I stayed here. I built my life here the long way. I raised my older son through Lewis Elementary years before Principal Froehlich arrived, without incident and without conflict. Lewis was simply my neighborhood school. It was ordinary, human, and focused on children. That is still what I want for my family.

I am not a chronic complainer. I am not looking for spectacle. I am not at war with this school. I assumed good faith. I complied with processes that were not written down and not consistently explained because I believed participation was real and that a room would eventually exist where questions could be asked and answered directly.

What I have learned is that participation is selective.

When a small group of parents approached Principal Froehlich and asked that the benches be permanently dedicated in honor of the LGBTQ community, the approval was immediate. The paint was dry before the sentence "good idea" had finished echoing. There was no schoolwide notice, no PTA vote, no open discussion, and no opportunity for community input. A permanent, values-laden transformation of shared school property occurred instantly.

At the same time, my efforts to secure a place on a meeting agenda moved slowly and without clarity. That contrast is not an accident. It communicates, unmistakably, which forms of engagement are expedited and which are managed.

Since October, I have been in regular and direct contact with Principal Froehlich and members of the PTA leadership. I see Principal Froehlich in person daily. We have exchanged multiple emails. I have met PTA committee members. There has been no lack of access to me.

When concerns were raised about comments I made on the PTA Facebook page, Principal Froehlich sent a blast communication to the broader school community referencing "hateful comments" and ongoing efforts to address them. That communication was sent without a single prior email, call, or in-person conversation with me, despite months of direct contact.

Shortly thereafter, PTA leadership circulated an internal email to PTA members referencing the situation and encouraging people to reach out to board members. Again, no one contacted me directly before the narrative was distributed. An email from that internal distribution was forwarded to me anonymously by another parent who believed the handling had become excessive. I have a heavily redacted copy of the email, but I have been asked not to share it directly and instead to use pull quotes, lest they be identifiable. Such is the environment these

days. I understand.

I did not go searching for private correspondence. It was sent to me because other parents were uncomfortable with what they were seeing.

A few other parents also contacted me privately after the blast communication was issued by Froehlich. They told me they had no idea what had happened until the message went out and they were directed to Facebook. They expressed concern that this was being escalated publicly instead of handled directly.

If leadership had concerns, they had my email. They had my phone number. They see me in person nearly daily. There was no barrier to a direct conversation.

Instead, I was framed publicly before being addressed privately.
This letter is not retaliation. It is transparency. What was circulated about me behind closed doors is now being addressed in the open, with documentation attached.

Now to the substance.

On the Progressive Pride program at Lewis, I support the gay community. I grew up in Portland, where gay men and women were not abstract identities. They

were neighbors, artists, business owners, mentors, teachers, and friends. This city did not require instruction on coexistence. That community created it and lived it.

That history is precisely why I object to what Progressive Pride now represents inside an elementary school.

The Progress Pride flag is not simply a symbol of equal protection under the law. It incorporates specific political, biological, and medical claims about gender identity. When a public elementary school adopts that symbol permanently across shared space, it is not neutral. It signals institutional alignment with an ideology that extends beyond sexual orientation.

The statistical reality matters. The overwhelming majority of children will grow up heterosexual. Estimates of adult same sex attraction generally fall between two and five percent, depending on methodology. Adults who identify as transgender represent well under one percent. I will provide numerous articles and positions from gay academics and community leaders who argue that same sex attraction is being conceptually erased within an aggressive gender identity movement, including Douglas Murray, Kathleen Stock, Andrew Sullivan, Glenn Loury, and other writers and scholars who have raised concerns about the collapsing of categories between homosexuality and gender ideology.

If we truly support the gay community, we should not blur the line between same

sex attraction and medicalized identity.

In the instructional materials provided to students, there is a lesson explaining puberty blockers, medically known as gonadotropin-releasing hormone agonists, in the context of gender transition. I have highlighted the portion.

While medication is not being distributed in a classroom, the issue is influence. When authority figures present medical pathways to nine and ten-year-olds in a positive and explanatory framework, children interpret that as guidance. At that age, adults are trusted authorities. Presenting a complex endocrine intervention as a reasonable response to identity distress is not neutral education. It is directional framing, and it is powerful.

This concern is not fringe. In recent years, the United Kingdom conducted an independent review of pediatric gender services and revised its clinical model. Sweden and Finland have restricted routine medicalization of minors outside research settings following evidence reviews and safeguarding concerns. Reasonable adults can disagree about conclusions, but no one can claim the issue is settled.

Legitimate question: Why is a hotly contested subject being presented as instructional?

Children deserve time. They deserve development without premature medical framing. Historically, most gender nonconforming children grew up to be gay adults without medical intervention. That reality should not be erased from the conversation.

The Equity Statement presents a separate problem.

When an institution tells children that their skin color places them inside a moral hierarchy before they have taken a single action, that is racial classification. When it teaches that one group is systemically advantaged because of race and another group is systemically disadvantaged because of race, that is racial essentialism. You cannot fight racism by reclassifying children by race. If systemic racism is operating within this school community, identify it specifically. Which policy. Which measurable outcome. Which documented pattern. If discrimination exists, correct it. Broad declarations without concrete evidence assign moral positioning before character or conduct enters the equation.

Equality cannot mean sorting children into moral categories based on race.

Thomas Sowell has written extensively on this issue. In "Discrimination and Disparities," he cautions that "One of the most dangerous myths of our time is that disparities imply discrimination." He has also warned that policies framed as compassionate can entrench dependency and distort incentives in ways that ultimately harm the very communities they claim to help.

In discussing what is often described as a "white savior" impulse, Sowell has argued that intellectuals who assume the role of speaking for minorities frequently substitute symbolism and moral posturing for measurable improvement, while insulating their own ideas from accountability. Those warnings are worth considering in any institution that classifies children by race in the name of equity.

Finally, I do not require social validation. I do not fear public disapproval. I am not susceptible to intimidation. That is precisely why the attempts to manage this quietly failed and why this letter now exists.

I understand, however, that not everyone is wired that way. I once cared deeply about belonging. I understand the instinct to remain silent when dissent carries a cost. I understand the fear of being ostracized, labeled, or made into a cautionary tale. The prospect of becoming a pariah in a tightly managed social environment is real.

If you share these concerns and choose not to attach your name to them, I will not expose you. I will not identify you. I will not betray private correspondence. I will carry your concerns alongside my own and present them directly.

If I receive no response from like-minded parents, I will take that as confirmation

that the school community is in full alignment. I will proceed accordingly.

For those who feel compelled to discharge their anger in my direction, do as you wish. Write the note. Send the message. Vent the indignation. The effort lives and dies with you and you alone. Whether you confide in your journal or in my inbox, the effect is the same. I will not be moved by noise.

I am formally requesting placement on the PTA agenda to present these concerns openly. If that request is denied, I expect written clarification of the policy preventing it and documentation demonstrating that the policy is applied consistently.

Disagreement is not danger. Dissent is not harm. Participation is not aggression.

I am asking for a room. I am asking for equal footing. I am asking for a school community confident enough to withstand open conversation.

Sincerely,
Allison Roberts

# EXHIBIT F



Ms. Allison Roberts,

I am writing to you to follow up on the safety concern that occurred yesterday, February 5th after dismissal.

The District recognizes that maintaining an academic community free from harmful, unlawful and/or disruptive behavior from non-school individuals is essential. Within the context of the trespass order, the policy and practice of Portland Public Schools, 'trespass' means to ban an individual from District property.

At this time we are banning you from being physically present on Lewis Campus for the reason of:
  • Threatening and intimidating members of the school community
The length of the trespass is for 1 year from the date of issue.  This means you are not allowed on Lewis's property until February 6, 2027,

We are also sending the trespass to you by certified mail.
For this time period the principal of Lewis will serve as your point of contact.
You are not allowed to attend any events or extracurricular activities at Lewis including PTA. However, we will arrange for you to attend virtual parent - teacher conferences and other requested meetings necessary for your children's education.

Failure to adhere to this trespass may result in law enforcement involvement.


Thank you,
Deanne Froehlich
Principal of Lewis Elementary

Portland Public Schools is an equal opportunity educator and employer.

# PORTLAND PUBLIC SCHOOLS
## SECURITY SERVICES
501 N. Dixon St, Portland, Oregon 97227

### NOTICE OF EXCLUSION FROM SCHOOL DISTRICT NUMBER 1 PROPERTY
## TRESPASS NOTICE

| Name: (Last) Roberts | (First) Allison | (Middle) | 2. Date of Birth: | 3. Contact Phone Number: ████████ |
|---|---|---|---|---|
| 4. Street Address: ████████ | | 5. City: Portland | 6. State: OR | 7. Zip Code: 97206 |
| 8. Date Served: 2/6/2026 | 9. Time Served: 8:00AM | 10. Location Served: Lewis Elementary 4401 SE Evergreen St. | | |

**11. Reason Trespass Notice Served:**
Threatening and intimidating members of the school community
The length of the trespass is for 1 year from the date of issue. This means you are not allowed on Lewis's property until February 6, 2027.

| 12. Name and Signature of District Representative: Deanne Froehlich | 13. Title of District Representative: Principal |
|---|---|

**14. Effective immediately, you are prohibited from coming on the property indicated below (only check one box).**

[✔] Specific School District 1 location **Lewis Elementary** and adjoining premises.

[ ] All School District Number 1 premises (see reverse side of form)

**15. You are trespassed for the following amount of time: (check only one box below)**

[ ] Expelled Student: For the duration of the expulsion

[ ] 3-months from the date this notice was issued

[ ] 6-months from the date this notice was issued

[ ] End of the current school year

[✔] 1 year(s) from the date this notice was issued (2+ years requires approval by the Director of Security Services)

[ ] Indefinitely (must be approved in writing by the Director of Security Services

- School District 1 premises includes buildings and properties to include: schools, administrative offices, education service centers, parking lots, garages, driveways, roadways, sidewalks, playgrounds, and playing fields owned, operated, or maintained by Portland Public Schools.
- If you return to the location(s) specified above during the period of exclusion, you may be ARRESTED for CRIMINAL TRESPASS IN THE SECOND DEGREE.
- According to Oregon law (ORS 164.245), a person commits the crime of criminal trespass in the second degree if he or she enters or remains unlawfully in or upon premises.
- You may appeal this exclusion by sending an email to Securityservices@pps.net. Your appeal must be emailed within five (5) business days of receipt of this exclusion notice. Call **503-916-3000** if you need assistance with submitting an appeal.
- I, the excluded person, do hereby understand the above information and that this notice is effective immediately.

**Deanne Froehlich, Principal**

_____
Signature of Excluded Person (or indication of refusal)

_____
Name and Title of person serving this notice

| White- Security Services | Yellow- Excluded Person | Pink- School (if applicable) | Revised 04/2025 |
|---|---|---|---|

# PORTLAND PUBLIC SCHOOLS
## SECURITY SERVICES
501 N. Dixon St, Portland, Oregon 97227

NOTICE OF EXCLUSION FROM SCHOOL DISTRICT NUMBER 1 PROPERTY

# TRESPASS NOTICE

| Facility Name | Address | Facility Name | Address |
|---|---|---|---|
| Abernethy | 2421 SE Orange St. | Kellogg | 3330 SE 69th Ave. |
| Terwilliger Access Academy | 6318 S Corbett Av | Kelly | 9030 SE Cooper St. |
| Ainsworth | 2425 SW Vista Ave. | Kelly Center | 9015 SE Rural St. |
| Ainsworth Annex | 2535 SW Vista Ave. | Kenton | 7528 N Fenwick Ave. |
| Alameda | 2732 NE Freemont St. | King | 4815 NE7thAve. |
| Applegate | 7650 N. Commercial St. | King Neighborhood Facility | 4906 NE 6th Ave. |
| Arleta | 5109 SE 66thAve. | Lane | 7200 SE 60TH Ave. |
| Astor | 5601 N. Yale St. | Laurelhurst | 840 NE 41stAve. |
| Atkinson | 5800 SE Division St. | Lee | 2222 NE 92nd Ave. |
| Beach | 1710 N. Humboldt St. | Lent | 5105 SE 97th Ave. |
| Beaumont | 4043 NE Fremont St. | Lewis | 4401 SE Evergreen |
| Benson | 546 NE 12th Ave. | Lincoln | 1750 SW Salmon |
| PEC | 501 N. Dixon St. | Llewellyn | 6301 SE 14th Ave. |
| Beverly Cleary | 1915 33rd Ave. | Maplewood | 7452 SW 52nd Ave. |
| Boise-Eliot | 620 N. Fremont St. | Markham | 10531 SW Capitol Hwy |
| Bridger Creative Science School | 7910 SE Market St. | Marshall | 3905 SE 91stAve. |
| Bridlemile | 4300 SW 4 7th Dr. | Marysville | 7733 SE Raymond St. |
| Buckman | 320 SE 16th Ave. | McDaniel | 2735 NE 82nd Ave. |
| Capitol Hill | 8401 SW 17th Ave. | Meek | 4039 NE Alberta Ct. |
| Cesar Chavez | 5103 N. Willis Blvd. | Metropolitan Learning Center | 2033 NW Glisan St. |
| Chapman | 1445 NW 26th Ave. | Hayu alqi uyxat- MPG Building | 1530 NE Glisan St |
| Chief Joseph | 2409 N. Saratoga St. | MT. Tabor | 5800 SE Ash St. |
| Clark | 1231 SE 92nd Ave. | Ockley Green | 6031 N Montana St. |
| Clarendon | 9325 N. Van Houten Ave. | Peninsula | 8125 N Emerald Ave. |
| Cleveland (including stadium) | 3400 SE 26th Ave. | Rice | 6433 NE Tillamook St. |
| Columbia Site | 716 NE Marine Dr. | Richmond | 2276 SE 41stAve. |
| Creston | 4701 SE Bush St. | Rieke | 1405 SE Vermont St. |
| Creston Annex | 4620 SE Powell Blvd. | Rigler | 5401 NE Prescott St. |
| CTC @ Green Thumb | 6801 SE 60th Ave. | Robert Gray | 5505 SW 23rd Ave. |
| Da Vinci Arts | 2508 NE Everett St. | Roosevelt | 6941 N Central St. |
| Duniway | 7700 SE Reed College Pl. | Rosa Parks | 8960 N Woodsley Ave. |
| East Sylvan, Odyssey | 1849 SW 58th Ave. | Rose City Park | 2334 NE 57th Ave. |
| Faubion | 3039 NE Rosa Parks Way | Roseway Heights | 7334 NE Siskiyou St. |
| Forest Park | 9935 NW Durrett St. | Sabin | 4013 NE 18th Ave. |
| Franklin | 5405 SE Woodward St. | Sacajawea | 4800 NE 74th Ave. |
| George | 10000 N. Burr Ave. | Scott | 6700 NE Prescott St. |
| Glencoe | 825 SE 51 st Ave. | Sellwood | 8300 SE 15th Ave .. |
| Grant | 2245 NE 36th Ave. | Sitton | 9930 N Smith St. |
| Grant- Hollyrood Campus | 3560 NE Hollyrood Ct | Skyline | 11536 NW Skyline Blvd. |
| Grout | 3119 SE Holgate Blvd. | Smith | 8935 SW 52nd Ave. |
| Harrison Park | 2225 SE 87th Ave. | Stephenson | 2627 SW Stephenson St. |
| Harrison Park | 2225 SE 87th Ave. | Sunnyside | 3421 SE Salmon St. |
| Hayhurst | 5037 SW Iowa St. | Tubman | 2231 N Flint St. |
| Holladay Annex | 7100 SE Division St. | Vernon | 2044 NE Killingsworth St. |
| Holladay Center | 2600 SE 71 st Ave. | Vestal | 161 NE 82nd Ave. |
| Hosford | 2303 SE 28th Pl. | West Sylvan | 8111 SW West Slope Dr. |
| Humboldt | 4915 N. Gantenbein Ave. | Whitman | 7326 SE Flavel St. |
| Ida B. Wells | 1151 SW Vermont St. | Wilcox | 833 NE 74thAve. |
| Irvington | 1320 NE Brazee St. | Winterhaven | 3830 SE 14th Ave. |
| Jackson | 10625 SW 35th Ave. | Woodlawn | 7200 NE 11th Ave. |
| James John | 7439 N. Charleston Ave. | Woodmere | 7900 SE Duke St. |
| Jefferson | 5210 N. Kerby Ave. | Woodstock | 5601 SE 50th Ave. |
| KBPS | 515 NE 15th Ave. | Youngson | 2704 SE 71stAve. |

# EXHIBIT G

## 7.40.010-AD(I)(A)1-2

"Harassment" means all forms of harassment including intimidation or bullying, acts of cyberbullying, sexual harassment and sexual violence.

1. Harassment, intimidation, or bullying of students is any act that substantially interferes with a student's educational benefits, opportunities or performance or has the effect of physically harming a student or damaging a student's property or creating a hostile educational environment, including interfering with the psychological well-being of a student and may be based on, but not limited to, the protected class status of a person.

2. Harassment, intimidation, or bullying of staff is conduct that has the purpose or effect of
unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

## 1.80.021-P

The District prohibits discrimination and harassment on any basis protected by law, including but not limited to, an individual's perceived or actual race, color, religion, sex, sexual orientation, gender expression or identity, national or ethnic origin, marital status, age, mental or physical disability, pregnancy, familial status, economic status, veteran's status, or because of the perceived or actual race, color, religion, sex, sexual orientation, national or ethnic origin, marital status, age, mental or physical disability, pregnancy, familial status, economic status, or veterans' status of any other persons with whom the individual associates. Race includes physical characteristics that are historically associated with race, including, but not limited to, natural hair, hair texture, hair type and protective hairstyles (a hairstyle, hair color or manner of wearing hair that includes, but is not limited to, braids, regardless of whether the braids are created with extensions or styled with adornments, locs and twists).

# EXHIBIT H



Allison Roberts <ally5858@gmail.com>

---

## Responding to an Incident at School Yesterday

1 message

---

**Lewis E.S. via ParentSquare** <donotreply+c1f53609-9ceb-5e3f-9e17-c411beef3af1@parentsquare.com>
To: ████████████

Fri, Feb 6, 2026 at 4:59 PM



Dear Lewis community,

I wanted to address an incident that took place yesterday and provide clarity around our response going forward.

**What happened:**
During dismissal, a parent approached another parent and began engaging in racial harassment, intimidation, and threatening behavior. Several families and students witnessed the incident and reported it to staff.

**Actions Taken:**
Unfortunately, this is not the first time this individual has made Lewis families and students feel unsafe. Over the past several months, we have observed a pattern of racial animus and harassment targeting vulnerable members of our community. When the pattern first emerged, we began working with the district's Civil Rights and Racial Equity and Social Justice teams to open a dialogue, deescalate the situation, and reduce harm for all involved. Over time, however, it has become clear that we needed to take more decisive action.

This morning, out of genuine concern for the safety of our students, we trespassed the individual from our school. This means that they are banned from the Lewis campus and all school events and activities – both virtual and in-person – for one year. If the individual is seen on campus, we ask that the community contact our main office. Leadership will handle the situation in accordance with district protocols.

**Next Steps:**

We understand that incidents like yesterday's can cause deep anxiety and concern. If your student would like to talk to a trusted adult, please reach out to a member of our student support team. Given that this situation has been developing for some time, we know that many in our community may be impacted, and we are currently considering other ways we can provide support and repair harm in the weeks ahead.

I want to reiterate what I wrote in my previous communication about our school community's shared values. Hate speech and discriminatory behavior have no place at Lewis. We honor and celebrate unique differences and contributions of every student, family, and staff member. We are fully committed to fostering civic engagement, respectful dialogue, and authentic collaboration, and we will always act with care and purpose to protect our values and ensure that our school remains safe for all students.

We are addressing this situation with the seriousness it deserves. Please don't hesitate to reach out to me if you wish to discuss this further.

Sincerely,
Deanne Froehlich, Principal
Chandra Wilson-Cooper, Senior Director of Schools

---

**Portland Public Schools**
https://www.pps.net/

Portland Public Schools aspires to graduate compassionate, critical thinkers who are able to collaborate to solve problems, and lead a more socially-just world. Central to this goal is affirming and operationalizing our deeply held community value of racial equity, social justice and inclusion.

View in ParentSquare

---

Stay involved with your child's learning and activities at school.

 

You received this email because you are a ParentSquare user in Portland Public Schools. If you received this email in error or wish to disable your account, click here to unsubscribe.

ParentSquare Inc · 6144 Calle Real, #200A · Goleta, CA 93117

# EXHIBIT I

**5th Grade Opt-Out Form:**
**Growth and Development & Violence Prevention Unit**

5th Grade students will receive instruction in Growth and Development & Violence Prevention from the "Rights, Respect, Responsibility" (3Rs) curriculum by Advocates for Youth as well as the Child Protection Unit from Second Step. Please review the overview of each lesson below. If you do not want your student to participate in a lesson, please place your initials in the "opt-out" box next to the lesson. Return the completed form to your students' teacher.

| Growth and Development & Violence Prevention Lessons School Year 25-26 | Opt-Out Initials |
|---|---|
| Class Agreements and Trusted Adults: Students will create class agreements that establish safety and respect throughout the Growth and Development unit. Students will also identify 2 -3 trusted adults that they can go to with questions or if they need additional support. | AR |
| Relationships and Boundaries: Students identify people within their various circles - from personal relationships to acquaintances. Personal boundaries are discussed - including why they are an important part of relationships. | AR |
| What is Love Anyway?: Students discuss the difference between liking and loving. They learn about common sexual orientations. | AR |
| Thinking Outside the Gender Box: This lesson is intended to help students understand the basic definitions related to gender identity (cisgender, transgender, nonbinary) and gender expression. It also explores the impact of gender role stereotypes. | AR |
| Sexual and Reproductive Anatomy: Students identify sexual and reproductive anatomy and basic function for both reproductive systems - bodies with vulvas and bodies with penises. | AB |
| It's All About the Hormones: Students place various stages of puberty and development on a timeline. They learn about/review the two main hormones involved in puberty, review the terms cisgender and transgender and are briefly introduced to the concept of puberty blockers for transgender youth. | A R |
| Puberty and Reproduction: Students learn about the steps involved in conception. | AR |
| Keeping Yourself Safe: Students will review the "Ways to Stay Safe" rules they learned in K-3 grades. They will practice recognizing safe and unsafe situations. Students will also apply refusal skills in response to situations that are unsafe. | AR |
| The Always Ask First Rule: Students will demonstrate using the "Always Ask First Rule," identifying trusted grownups they can go to when they want to try activities that involve some risk. Asking permission from the parent or person in charge protects students from dangerous situations and helps parents and caregivers know what students are doing. | AR |
| Unsafe and Unwanted Touches: Students will discuss the difference between unsafe and unwanted touches and how to refuse both. | AR |
| The Private Body Parts Rule: Students will understand that no one should touch, or ask to see their private parts except in situations involving a doctor or nurse. They will also recognize that no one should show them, or ask them to touch their private body parts. | AR |
| Practicing Staying Safe: Students will review the Never Keep Secrets rule from grades K-3 and apply it to the Private Body Parts rule. They will identify how to get help if someone breaks the Private Body Parts rule. | AR |
| Reviewing Safety Skills: Students will apply the Child Protection Unit's rules and skills learned to scenarios presented in a video. | AR |

Guardian Name: ALLISON ROBERTS          Student Name: _____

Guardian Signature: Allison Roberts     Date: 2·8·2024

# EXHIBIT J



# PORTLAND PUBLIC SCHOOLS

## Office of School Performance

501 North Dixon Street / Portland, OR  97227
Telephone: (503) 916-2000
Mailing Address: P. O. Box 3107 / 97208-3107

**Trespass Appeal Response**

May 12, 2026

Ms. Allison Roberts
▮▮▮▮▮▮▮▮▮▮
Portland, OR 97206

Dear Ms. Roberts,

I am writing to follow up on the Trespass Appeal Hearing held on May 8, 2026, between you and the Trespass Appeal Panel. The panel included representatives from PPS Security Services, Facilities, and me in my role as Senior Director of Schools for the Grant and Franklin clusters.

Following our meeting, the panel reconvened to carefully review your appeal. In reaching its decision, the panel considered:

- The attestation of Chandra Cooper which was sent to you prior to the hearing
- The oral information you provided to the panel in defense of your actions with the Principal and the Lewis community

After reviewing all available information, the panel determined that the trespass will be upheld.

You raised concerns about your ability to support your student with this trespass in place. Please know that your student's well-being and success remain our highest priority. The Principal will work with you to continue this support with the trespass in place.

You also raised concerns about due process.  As had been explained in an earlier communication with you, the due process accorded for the violation of a civil trespass is notice to the person that their actions may violate district policy and a right to appeal the trespass. The notice is found in two of our administrative directives:  7.40.010-AD and 3.30.051-AD.  Both alert the person to the expectations the district has for visitors on our property.  You were

informed of the basis for your trespass in the February 6, 2026 letter from the Principal and the attestation that was sent to you in response to your request for an appeal.  Your request to appeal the trespass is the final element of your due process rights.

Thank you for your engagement with Portland Public Schools. We remain committed to serving you and your family and supporting your student's continued success.

Sincerely,

*Raddy Lurie*

Empowering School Communities,
Mr. Raddy Lurie
Senior Director of Schools


CC:  Deanne Froehlich, Principal, Lewis Elementary
    Chandra Wilson-Cooper, Senior Director of Schools
    Molly Romay, Senior Director, Security Services

# EXHIBIT K

FOR THE RECORD

**My name is Allison Roberts.** I am the parent of ▓▓▓▓▓▓▓▓▓▓ at Lewis Elementary.

I am writing this not to humiliate anyone, nor to theatrically "save face." Most people's opinions of me matter very little compared to the wellbeing of my children and the truth of what actually occurred over the past year.

Had I prevailed in what was, in retrospect, a predictably doomed appeal process, I likely would not be writing this second letter at all.

But silence increasingly functions as consent, and this is, whether some like it or not, a shared community space. I will not be intimidated into silence, nor will I quietly absorb what I believe were falsehoods, reputational distortions, institutional punishments, and public insinuations while those responsible move on untouched and unexamined.

I am, by nature, fairly private, conflict-averse, and largely disinterested in social warfare. People who know me well understand that. But I also hold the rather old-fashioned belief that if you are clearly wronged, particularly when your children are harmed in the process, you do not simply bow your head and disappear for the comfort of others. You confront it, document it, and correct the record.

That is what this document is intended to do.

**This is not revenge. It is rebuttal.**

It is a response to a year in which my family was subjected to escalating rumor, reputational distortion, procedural unfairness, and ultimately the extraordinary act of a one-year trespass from my children's elementary school without prior warning, meaningful due process, or any serious opportunity to defend myself before punishment was imposed.

People are free to draw their own conclusions after reviewing the documentation, emails, timelines, and statements for themselves.

I simply refuse to allow one side of this story to exist uncontested.

---
**Addendum**

I state plainly and without ambiguity that the chronology and representations described throughout this document are accurate to the best of my knowledge and recollection.

I further invite Principal Froehlich, Brooke Cogan, Olivia, John or any involved party to publicly produce:

- emails,
- written warnings,
- meeting notes,
- documented complaints shared with me at the time,
- or any communication whatsoever

that materially contradicts the sequence of events I have laid out here.

Specifically, I was never warned prior to the trespass that I was allegedly viewed as threatening, racist, dangerous, or unsafe. I was never informed that district Civil Rights or Racial Equity teams were supposedly engaged in an escalating concern process regarding me, and I was never presented with specific accusations before punishment was imposed.

And on February 4th, 2026, mere hours before I initiated an in-person conversation with Principal Froehlich, I received an email from her explicitly stating that the matter involving ██ had been resolved appropriately, was not a school concern, and that "bringing up this topic again now was done with a different intention."

At this point, the simplest way to resolve many of these contradictions would be for PPS or school leadership to publicly produce actual documentation contradicting what I have laid out here rather than relying on anonymous summaries, institutional shorthand, or broad insinuations.

If there were ongoing concerns about my conduct for months, where are the warnings? Where are the emails informing me that parents allegedly feared me? Where are the documented attempts at de-escalation? Where is the correspondence showing I was informed district Civil Rights or Racial Equity teams were supposedly involved regarding my conduct?

If such documentation exists, then by all means, produce it publicly.

Because as things currently stand, the timeline presented to the community is extraordinarily difficult to reconcile with the private communications I actually received from school leadership in the days immediately preceding my trespass.

And I suspect many parents, regardless of politics, should find that troubling.

Not because they must agree with me ideologically or approve of my tone, but because no parent should be comfortable living under a system where reputational destruction and exclusion from their child's educational life can occur absent clear warning, transparent standards, meaningful due process, or substantiated evidence.

That should concern people far beyond me.

As for Brooke Cogan, I will again state plainly:

**You still have the opportunity to publicly acknowledge the harm done to ███, correct the record, and apologize.**

That would not erase what happened.
But it would at least demonstrate the kind of moral seriousness and humanity that I believe has been largely absent throughout much of this ordeal.

---

Final Note

It is not lost on me that children are vulnerable, impressionable, and deeply affected by the behavior of adults around them. A parent recently put it to me that I might be selfishly sacrificing my children over this issue, and that many of her friends had commented the same. Think about that — a host of women that instinctively know the adults at the school will predictably punish my child if I continue to dissent. That is precisely why I am speaking publicly now.

I am not publishing this to humiliate anyone, nor am I interested in endless personal warfare or suburban spectacle.

I am writing because I believe what occurred over the past year was profoundly unjust, both procedurally and morally, and because silence in the face of falsehood eventually becomes complicity in it.

I also believe communities function best when people are allowed to disagree openly without fear of social exile, reputational destruction, or institutional punishment.

To the incoming principal, future PTA leadership, and broader Lewis community, I want to make something very clear: I am not volatile. I am, however, relentless when I believe my children or my family have been treated unjustly, and there is an important difference between those two things.

I do not demand ideological conformity, seek special treatment, or expect universal agreement with my politics or worldview.

What I do expect is equal treatment, basic fairness, freedom of speech, and honesty in how conflicts are handled and represented.

I will continue standing up for those principles, for myself, and for my children.

I am doing so not because I enjoy conflict or crave attention, but because I do not believe decent people should quietly submit to falsehood, intimidation, or reputational harm simply because doing so would make others more comfortable.

I have no intention of disappearing politely from a community my family has been part of and invested in for years.

People are free to agree with me or disagree with me.

But I will not quietly accept what I believe are falsehoods about my family as the price of remaining socially acceptable.

**Sincerely,**
**Allison Roberts**

-------------------------------------------------------------------------

**Feedback from anonymous parents:**

Have you done a FOIA request to confirm the make/model of the school cameras to confirm whether they do not actually have audio capabilities. It would not be a shock if Deanne and/or the district was withholding.

_____

Olivia has been trying to get people trespassed from Lewis since she arrived here. It started with another family in the neighborhood when [another parent] called Olivia out on her narcissistic personality disorder, and Deanne out on how bad she is at her job. They teamed up and went insane on her family and targeted her son.

———————

One thing you may want to look into is that similar concerns about Deanne and Olivia lying (in cahoots) have come up before in prior Lewis situations a couple years ago. In those instances, what began as questions about Deanne's poor communication was later framed very differently by others involved - Olivia ended up calling another mom and her family racist and also tried to get them trespassed and even asked another PTA mom to lie to the police on her behalf to lie that they were stalking Olivia. It never went anywhere because the police knew olivia was insane with a personality disorder and lying about the situation. You may want to verify whether this is a recurring pattern and include that context for balance.l and in your case. I'd take this to the media if it had happened to me. Olivia tries to get everyone trespassed from the school and I believe has borderline personality disorder. Deanne got tangled up in her lies early then used her as a weapon. And clearly continues to.

———————

This is not the first time this has happened. Deanne has a history of using the PTA (and Olivia specifically) to do her dirty work.

———————

Some families have been in the neighborhood long enough to know where all Deanne's skeletons are. Olivia's too. Keep digging.

Olivia got into fights with Megan too and now Megan's kids go to another school.
——-------

It is time to have your lawyer subpoena the witnesses.
——-----

Megan has been through the same thing with Olivia. How many people has she done this sort of thing to?
——-----

Ask Pauline what Olivia did to her.

—-----

It takes a long time to realize Olivia's toxic behavior- once you are the target she will stop at nothing. And if she convinces PPS it's all over. This all should have been stopped especially once a child is used as bait.

—-----

Olivia is well known as dishonest. She is friends with Tobias Forsberg as well who is on the PTA board with Brooke Cogan. Not a coincidence. Brooke only used her position to take the schools money and support liars like Olivia- as well as paint you in a bad light- she has called PPS security (tax dollars) multiple times because she is "scared".

PART I
**The Trespass and the Narrative Constructed Around It**

On February 4th, 2026, I met in person with Principal Deanne Froehlich at my own request after earlier exchanging serious but cordial emails and briefly speaking after school.

I flagged her down because I wanted to further discuss the increasingly unhealthy atmosphere surrounding the PTA, parent conflict, and the events that had unfolded over the course of the school year. This was directly connected to our earlier email exchange regarding the rumors involving my daughter.

We spoke at length.

During that conversation, Principal Froehlich made several statements to me directly that stand in remarkable contrast to the narrative later constructed around me publicly. Among other things, she stated she did not consider me a "problem parent," that the PTA had become a "coffee clutch" and "mean girls club," and that the rumors involving ██ had caused real harm and should never have resurfaced.

We also discussed the broader dysfunction and hostility that had developed around disagreement within the Lewis community.

At no point during that meeting did Principal Froehlich:

- warn me that parents allegedly feared me,

- inform me that complaints had supposedly accumulated for months,
- state that district Civil Rights or Racial Equity teams had been involved regarding my conduct,
- suggest I was under investigation for racial harassment,
- or indicate that trespass was even remotely being contemplated.

The conversation was sufficiently cordial and reassuring that afterward I sent a fruit arrangement to the school as a gesture of appreciation for her time and openness. Such was my confidence that she too recognized the dysfunction and escalation surrounding the situation.

**Forty-eight hours later, I was issued a one-year trespass from Lewis Elementary.**

Not a school-year trespass.
**A full calendar year.**

The allegations listed in the supporting materials were genuinely surreal to read because many described conduct, language, and behaviors I had never before heard attributed to me and would never use.

I received no warning, no escalating disciplinary process, no meaningful opportunity to respond before punishment, and no direct confrontation regarding the allegations themselves. Instead, I received what amounted to reputational sentencing first, followed by a tightly controlled appeal process afterward.

On February 6th, the school distributed a ParentSquare communication to the broader Lewis community stating that a parent had engaged in "racial harassment," "intimidation," and "threatening behavior," while additionally claiming district Civil Rights and Racial Equity teams had already been working behind the scenes regarding a "pattern of racial animus and harassment targeting vulnerable members of our community."

I then received what PPS termed an "attestation" supporting the trespass.

When I requested actual evidence substantiating the accusations against me, I was informed it did not need to be provided. There were no names, no dates, no specific contextual descriptions, and no meaningful evidentiary burden whatsoever.

From my perspective, allegations appeared to be treated as substantially established before I was ever given a meaningful opportunity to respond.

I requested video footage from in and around the school that I believed would substantiate my innocence. I was delayed for weeks and ultimately informed I would need to pay hundreds of dollars in labor costs to obtain it.

I agreed.

Yet before any meaningful review process occurred, I was informed my appeal hearing had already been scheduled.

The "hearing" itself was lamentable.
I appeared before district personnel, a PPS attorney, two janitors — one of whom was visibly working during the hearing — and a gym coach.

When I raised concerns regarding the absence of warning, evidence disclosure, and meaningful due process prior to punishment, the district attorney tersely informed me that the appeal itself was my due process.

The one-year trespass was upheld.

**Worth noting:** One-year exclusions are highly unusual. Longer sanctions generally require additional procedural scrutiny and substantiation. I was never presented with evidence substantiating many of the allegations later used to justify the trespass.

**Principal Froehlich, I once again publicly invite you to produce documentation materially contradicting anything I have stated here.**

The district later claimed there had been ongoing attempts to "open dialogue" and "deescalate." Yet the first time I learned many of these allegations supposedly existed, I had already been formally removed from campus.

Prior to receiving the trespass materials, I had never been informed by Principal Froehlich, verbally or in writing, that I was allegedly viewed as threatening, racist, dangerous, or unsafe. I received no warning, no disciplinary notice, no mediation request, and no indication whatsoever that a one-year trespass was even being contemplated.

Quite the opposite.

Throughout the year, I repeatedly reached out attempting to communicate directly and resolve concerns through ordinary channels. At no point did Principal Froehlich independently contact me to warn that parents allegedly feared me or that district officials were supposedly involved in an escalating response process regarding my conduct.

The statements above are accurate to the best of my knowledge and recollection.

People may draw their own conclusions from that sequence of events.

My own view is simple:
**The process felt largely predetermined before I was meaningfully permitted to defend myself.**

---

PART II
**The Hijab Allegation and the Reality of What Occurred**

Among the most inflammatory allegations circulated about me was the claim that I told another parent, "fuck your hijab."

**I unequivocally deny ever making that statement or anything remotely resembling it.**

At the time of the interaction, I did not even understand the head wrap in question to be intended as a traditional religious hijab.

In my own travel and cultural experiences throughout Muslim-majority countries, I have consistently been taught that traditional mosque etiquette and modest dress standards involve coverage of the hair and neck. As a result, I simply did not perceive the garment in question as religious attire during the interaction itself and therefore would certainly never have commented on it.

Fashion aside, I have traveled extensively throughout Muslim-majority countries and have always approached Muslim cultures, traditions, and places of worship respectfully.

My family and I spent nearly three weeks in Turkey last month to celebrate Ramadan and Eid. Hardly the itinerary of someone harboring hatred toward Muslims or Islamic culture.

As the many parents at Lewis who anonymously inventory my Facebook will know, I hold strong opinions regarding radical political Islam and organizations such as the Muslim Brotherhood. Those views are public and unapologetic. But criticism of extremist political movements is not hatred toward ordinary Muslim people, Muslim families, or religious worship.

In fact, during my recent travels I had many thoughtful conversations with local Muslims on precisely those distinctions.

Best to stop cherry-picking Facebook posts and twisting them into medieval morality theater. It is intellectually unserious, fear-driven, and frankly embarrassing behavior for adults.

But back to the actual events.

The only genuinely racialized interaction I personally experienced at Lewis involved Olivia, the woman later connected to the hijab allegation.

I had never formally met her before, though I had seen her around school many times.

Upon leaving Principal Froehlich's office on February 4th after what I believed had been a productive discussion, I saw Olivia sitting on a bench outside.

The previous evening I had attempted to speak during a PTA meeting remotely and my microphone had allegedly malfunctioned. Conveniently.

I approached Olivia because I genuinely hoped another parent might at least hear me as a human being rather than the highly distorted version of me that I increasingly felt was circulating within parts of the community.

We spoke.

She told me she did not agree with my politics but believed I had been treated poorly at the meeting and that she believed in free speech.

I thought it was a constructive conversation.

When we parted, I asked if she wanted to continue the discussion the following day. She agreed. I asked how she took her coffee.

"With cream."

The next day I arrived and found her husband John present as well. I apologized for bringing only one coffee, as I had not known he would be there.

The conversation eventually turned toward the PTA's equity statement, ideological language, and broader historical grievances.

At one point, I distinctly recall John stating multiple times that "all white people are disgusting" during the interaction.

I responded angrily and told him, "You're the racist. Fuck you. Fuck off."

Good look for me? No.

I should not have cursed in front of children and I regret allowing myself to become angry.

But I never said anything whatsoever about Olivia's head wrap.

**UPDATE** While passing these out today a parent confirmed that they heard the entire altercation and said that they too heard John saying "All Whites are disgusting" several times.

**Also worth noting:** An anonymous parent later contacted me regarding this interaction and wrote:

> "Olivia is not an honest person in any way… there is a camera looking right where you were speaking with her and her husband in case you need that."

The same individual further stated:
> "For the record, don't believe you threatened Olivia."

I subsequently requested the footage from PPS because I intended to publicly release it. I was informed obtaining it would cost $341. I agreed. I was then informed the footage allegedly contains no audio. Perhaps. Perhaps not.

People are entitled to disagree with my opinions.

They are not entitled to attribute statements to me that I did not make.

---

PART III
**The Rumor About My Daughter**

There is another matter that has still never been meaningfully addressed: the rumor circulated regarding my daughter, █ .

In January of 2026, amid ongoing disputes surrounding the PTA and my repeated attempts to speak publicly regarding school culture, transparency, and ideological programming, I received an anonymous email from a parent.

The sender alleged that PTA President Brooke Cogan was actively gatekeeping my ability to speak publicly and that rumors involving my daughter were circulating within PTA-related parent circles during the same period I was publicly challenging aspects of PTA leadership and school culture.

The sender wrote:
> "She is also spreading lies about your kids which is not ok."

The sender further stated that despite not politically agreeing with me, they nevertheless believed I was being unfairly gatekept, that false information and nonexistent "rules" were being invoked, and that an effort was underway to socially isolate and marginalize me before I was even allowed to publicly speak.

At the time, I hoped the claims were exaggerated or based on misunderstanding.

Unfortunately, subsequent events caused me to take those concerns more seriously.

On February 4th, 2026, Principal Froehlich sent me an email confirming that a 2024 incident involving █ had already been handled appropriately by school staff and counselor Jessy Gretzinger, that no gun had ever been brought to school, that the matter had not remained a school concern, and that staff had no ongoing concerns regarding █ whatsoever.

Principal Froehlich further wrote:
> "It is very clear that bringing up this topic again now was done with a different intention."

She also informed me that another parent had become so alarmed by the rumor circulating among adults that he contacted the school asking whether he should remove his child because he feared the possibility of a shooting.

That fact alone demonstrates the seriousness of what occurred once a resolved student matter was reintroduced into adult political and social conflict.

Most importantly, ██ eventually became aware of the rumor through other students and came home crying.

No child should ever be placed in that position because adults failed to exercise restraint, judgment, or basic humanity.

What followed afterward was perhaps the most revealing aspect of the entire ordeal.

Rather than directly addressing the harm caused to ██ , the response from PTA leadership became increasingly procedural and impersonal. I was repeatedly directed toward mediation, nonprofit frameworks, conflict resolution policies, standing rules, committees, and governance structures.

What remained conspicuously absent throughout nearly every exchange was the child at the center of the issue.

In my view, insufficient attention was given to the emotional impact the rumors had on ██ once they began circulating among students and parents.

To this day, I remain struck less by the original rumor itself than by the complete absence of meaningful public correction afterward.

School leadership had already informed me privately that the underlying matter involving ██ had been resolved and was not considered an ongoing safety concern.

And yet no meaningful correction was ever issued to the broader community.

# EXHIBIT L



May 29, 2026

Dear Lewis families and staff,

I wanted to reach out about an incident that took place yesterday during dismissal that made many students, families, and staff members feel targeted, unsafe, and unwelcome. Two individuals passed out fliers that included messaging that is antithetical to everything we stand for as a community.

I want to be very clear – Lewis is an inclusive school community that respects and celebrates the diversity of all who call it home, and we are committed to continuing the work of making sure every student feels safe, valued, and respected here. When harm occurs, students deserve a response that is prompt, clear, and supportive. Our school must be a place where all students can show up as themselves without fear, and where every student knows that the adults around them will respond with clear action and moral clarity to disrupt the harm and provide support and care.

In a school setting, our responsibility is to maintain a safe and welcoming learning environment for every student, across all identities and backgrounds, where discrimination, harassment, intimidation, and exclusion are not acceptable and where belonging is actively protected. When an incident occurs that may be experienced as bias related or harassing, our approach is to center student impact, confirm the facts, and take steps that are supportive, preventive, and aligned with district procedures. Our Lewis team is engaged and continues to be fully invested in this work.

Support remains available. If you are a student who feels impacted, unsafe, or simply needs to talk, please reach out to Lewis leadership or a member of our counseling team.

https://mail.google.com/mail/u/0/?ik=f5de4dc7e8&view=pt&search=all&permthid=thread-f.1866566449425217207&simpl=msg-f.1866566449425217207    1/2

5/29/26, 10:18 PM                              Gmail - Incident During Dismissal Yesterday

Thank you for partnering with us to uphold a school community where every student is safe, respected, and able to learn. I look forward to seeing you tonight at our annual picnic where we will continue to celebrate everything that makes Lewis such a unique and special place to learn and grow.

Sincerely,
Deanne Froehlich, Principal

# EXHIBIT M

 **Gmail**

**Allison Roberts <ally5858@gmail.com>**

# Formal Warning

9 messages

---

**Chandra Wilson-Cooper** <ccooper2@pps.net>                                    Mon, Jun 1, 2026 at 12:24 PM
To: Allison Roberts ███████████████ >
Cc: Raddy Lurie <rlurie@pps.net>, Molly Romay <mromay@pps.net>, Deanne Froehlich <dfroehlich@pps.net>, Isaac
Cardona <icardona@pps.net>

Allison,
It has been brought to my attention that on Thursday, May 28th you distributed a letter that specifically names Lewis staff
and Lewis community members. This is continued harassment which was the basis of your trespass on February 6,
2026.

PPS policies 7.40.010-AD and 1.80.021-P .  Harassment is defined in the policy as:

> "Harassment" means all forms of harassment including intimidation or bullying, acts of cyberbullying, sexual
> harassment and sexual violence.

> 1. Harassment, intimidation, or bullying of students is any act that substantially interferes with a student's
> educational benefits, opportunities or performance or has the effect of physically harming a student or damaging
> a student's property or creating a hostile educational environment, including interfering with the psychological
> well-being of a student and may be based on, but not limited to, the protected class status of a person.
> 2. Harassment, intimidation, or bullying of staff is conduct that has the purpose or effect of unreasonably
> interfering with an individual's work performance or creating an intimidating, hostile, or offensive working
> environment."


PPS Policy 1.80.020-P prohibits discrimination and harassment on any basis protected by law, including but not limited to:

> "... an individual's perceived or actual race, color, religion, sex, sexual orientation, gender expression or identity,
> national or ethnic origin, marital status, age, mental or physical disability, pregnancy, familial status, economic
> status, veteran's status, or because of the perceived or actual race, color, religion, sex, sexual orientation,
> national or ethnic origin, marital status, age, mental or physical disability, pregnancy, familial status, economic
> status, or veterans' status of any other persons with whom the individual associates. Race includes physical
> characteristics that are historically associated with race, including, but not limited to, natural hair, hair texture, hair
> type and protective hairstyles (a hairstyle, hair color or manner of wearing hair that includes, but is not limited to,
> braids, regardless of whether the braids are created with extensions or styled with adornments, locs and twists)."

I am sending you this as a written warning to cease all forms of harassment towards any Lewis community and
staff members to include written, physical, and verbal interactions. Failure to comply with these expectations may result in
an extension of your trespass including up to indefinitely and/or across all PPS campuses.

It is our expectation that all staff, students, and community members follow the PPS code of conduct.

Chandra

*Chandra Cooper*
*Senior Director of Core Enrichment & MTSS*
*Interim Senior Director of Schools*
*Portland Public Schools*
*503 896-0050*
*ccooper2@pps.net*
*MTSS Website*

---



Begin forwarded message:

> **From:** Chandra Wilson-Cooper <ccooper2@pps.net>
> **Date:** June 1, 2026 at 12:25:07 PM PDT
> **To:** Allison Roberts ████████████
> **Cc:** Raddy Lurie <rlurie@pps.net>, Molly Romay <mromay@pps.net>, Deanne Froehlich <dfroehlich@pps.net>, Isaac Cardona <icardona@pps.net>
> **Subject: Formal Warning**

[Quoted text hidden]

---

**Allison Roberts** ████████████████     Mon, Jun 1, 2026 at 3:17 PM
To: Chandra Wilson-Cooper <ccooper2@pps.net>
Cc: Raddy Lurie <rlurie@pps.net>, Molly Romay <mromay@pps.net>, Deanne Froehlich <dfroehlich@pps.net>, Isaac Cardona <icardona@pps.net>, Ben Roberts <benjosephroberts@gmail.com>

Chandra,

I am in receipt of your email.

Because your message threatens a possible extension of my existing trespass, including potentially "up to indefinitely and/or across all PPS campuses," I am requesting immediate and specific clarification regarding the factual and legal basis for your warning.

First, I need to correct the characterization that I "distributed a letter."

I did not enter Lewis Elementary property. I did not attend a Lewis event. I did not approach students. I did not disrupt dismissal. I did not compel anyone to take anything, read anything, respond to anything, or engage with me.

What occurred was this: while off school property, I offered interested adults a single sheet of paper containing a QR code and a brief description of publicly available material. Any adult who received it was free to decline it, discard it, ignore it, or read it at their own discretion.

That distinction matters.

I am therefore asking PPS to identify precisely how my off-campus speech, involving publicly available material and voluntarily accepted by adults, falls within PPS jurisdiction or violates the policies you cited.

Please clarify the following:

1. What specific conduct are you alleging constitutes harassment?
2. Which exact statements in the QR-linked material are alleged to be harassing?
3. Which exact statements are alleged to be false?
4. Which exact individuals are alleged to have been harassed?
5. Is PPS taking the position that naming Lewis staff or adult community members in a public account of events in which they participated constitutes harassment?
6. Is PPS taking the position that a parent may not publicly discuss school-related events, district actions, public communications, or documents in her possession?
7. Is PPS taking the position that I may not speak about Principal Froehlich or Lewis Elementary in public at all?
8. Does PPS believe its policies apply to my speech while I am standing on public property and speaking to adults who voluntarily accept or decline printed material?
9. If so, please identify the exact policy language granting PPS authority over that off-campus speech.

10. Please identify whether the warning applies only to direct contact with Lewis staff and community members, or whether PPS is attempting to restrict public commentary, social media posts, private conversations, texts, emails, or other forms of speech about this matter.

To be clear, I understand that PPS may regulate access to its property. I understand that PPS may set conduct expectations for visitors while on campus. But your email appears to go much further than that. It appears to suggest that my public discussion of events, documents, and individuals involved in those events may itself be treated as harassment.

That is a serious position, and I am asking PPS to state it plainly if that is in fact the district's position.

I am also asking PPS to explain how this warning fits into the broader sequence of events.

This is the first written warning I have received from PPS or Lewis regarding alleged harassment. It arrives after I was already issued a one-year trespass, after a public communication was sent to the Lewis community characterizing the situation in highly damaging terms, after my appeal was denied, and after my family has already been publicly humiliated and discussed within the school community.

I have asked repeatedly for clarity, evidence, and an opportunity to respond to specific allegations. Instead, the pattern appears to be that broad conclusions are announced first, and specifics are withheld or never provided.

That is not a workable standard.

If PPS believes I have engaged in harassment, then PPS should identify the specific conduct, the specific statement, the specific person harmed, and the specific policy provision allegedly violated. A general assertion that my speech is "continued harassment" is not sufficient for me to understand what PPS is demanding or how I am expected to comply.

I am also concerned by the vagueness of the phrase "cease all forms of harassment towards any Lewis community and staff members to include written, physical, and verbal interactions."

What does that mean in practice?

Am I prohibited from emailing district officials?

Am I prohibited from responding to allegations made about me?

Am I prohibited from naming individuals who participated in documented events?

Am I prohibited from sharing public records?

Am I prohibited from discussing Principal Froehlich with another parent?

Am I prohibited from speaking about Lewis Elementary at a grocery store, on a sidewalk, online, or in a private text message?

I am asking these questions because PPS is threatening further restriction while failing to define the boundary it claims I crossed.

I am not asking for permission to harass anyone. I am asking PPS to distinguish harassment from protected public speech, criticism of public actions, discussion of documented events, and publication of my own account.

Those are not the same thing.

I have not threatened anyone. I have not encouraged anyone to contact, intimidate, or harass anyone. I have not entered school property. I have not disrupted a school event. I have not forced anyone to receive or read anything.

I have published my account of events and supporting documentation because PPS and Lewis have already publicly characterized me in ways I strongly dispute. I have a right to respond to public allegations and to correct the record regarding matters affecting my name, my children, and my family.

If PPS disagrees with specific statements I have made, please identify them.

If PPS believes specific portions of my account are inaccurate, please identify them.

If PPS believes my conduct violated a specific policy, please cite the precise provision and explain how it applies to off-campus speech directed to adults on public property.

Until PPS provides that clarification, your warning remains too vague to meaningfully comply with and too broad to evaluate.

# EXHIBIT N

 **Administrative Directive 4.30.061-AD
Transgender, Nonbinary and Gender
Expansive Students**

### I. Overview – Student Focused Procedures

It is the District's goal to create a safe and welcoming environment for our students and staff, free of transphobia and homophobia. This directive is meant to identify procedures and provide guidance to district and school staff so that transgender, nonbinary and gender expansive students are fully included in their school communities and have the supports necessary to actively participate in all school activities free of discrimination. When creating a plan of action or making decisions around how best to support a student, within the parameters of this directive, every effort should be made to include the student(s) and families themselves.

The District is continually improving and refining our efforts toward greater inclusion for LGBTQ2SIA+ and affirmation of staff and students. This requires an unwavering commitment to a systematic shift in paradigms to increase the understanding of sexual and gender diversity. Such a shift requires appropriate communication, professional development, collaboration with our labor partners, and a commitment from the Board, District staff, students, and families.

This directive furthers the Board of Education's Non-Discrimination Policy 1.80.020-P which states: "The District is committed to equal opportunity and nondiscrimination in all its educational and employment activities. The District prohibits discrimination based on race; national or ethnic origin; color; sex; religion; age; sexual orientation; gender expression or identity; pregnancy; marital status; familial status; economic status or source of income; mental or physical disability or perceived disability; or military service." This directive also furthers the Board of Education's Anti-Harassment Policy 4.30.060-P, which prohibits harassment, discrimination, bullying and retaliation based on a person's protected class.

### II. Definitions

Please refer to the LGBTQ2SIA+ Supports Glossary to learn more about accepted terminology for important concepts relating to gender expression and identity. This glossary will be updated regularly as definitions evolve or new words come into use.

### III. Gender Identification Confidentiality

Families are not required to disclose their student's sex assigned at birth to any

school representative. It is their right to maintain this confidential medical information. Additionally, the Family Education Rights Privacy Act (FERPA) applies to all aspects of a student's identity, including gender identity. Under FERPA, generally only those school employees "determined to have legitimate educational interest" may have access to a student's records or the information contained within those records.

   a. The school should work closely with the student and, when indicated, their family in devising a plan to maintain confidentiality and inform school staff on a need-to-know basis. Or, if the student wishes to have other students be aware that they are transgender and/or that they are transitioning, they should be supported in doing so. In either case:

      i. Portland Public Schools utilizes the Gender Identity Support Guide to assist students, their trusted adults, and staff in developing a comprehensive plan to support the unique needs of the student.

         1. Students/caregivers may use the Meeting Request form to begin the process of creating a support plan.

            a. Schools must respond to the request within 10 business days of receipt.

         2. All support plans are iterative and should be revisited at a regular interval and immediately following any major changes for the student.

      ii. Students may include their trusted adult(s) in this process.

         1. Trusted adults may be caregivers, teachers, coaches, counselors, social workers, school secretaries, educational assistants, nutritional services employees, custodians, school administrators, the LGBTQ2SIA+ Supports Program Manager, etc. Students may choose to include trusted adults whose roles are not represented by this specific list.

         2. It is not required for students to include all of these parties in this process.

      iii. The school should make every effort to restrict access to the records maintained by the school (birth certificates, etc.) which identify assigned sex, to persons authorized in the plan designed with the student.

   b. Student Information System (SIS) reports generated by the school, and that could be seen by students and/or staff who do not have a need to know, should not reveal the "gender marker" field for a student.

      i. Classlists, attendance, and report cards should not include the "gender marker" field.

      ii. SIS generated reports should include, where possible, asserted names (preferred name field) and, if available, pronouns for students.

   c. The District and the State of Oregon recommend that all student transcripts be gender neutral and contain no indicator of gender for any student. Schools should suppress gender for all student transcripts, except when a student makes a specific request to show their gender on their transcript.



   d. Diplomas and transcripts for transgender students should be printed in duplicate, one in their legal name and the second in their asserted name.

   e. In some circumstances, our transgender, nonbinary or gender expansive students do not want their caregivers to know about their transgender, nonbinary, or gender expansive status and that they are expressing their asserted gender at school. We must balance our goal of supporting the student with the requirement that we keep caregivers informed when there are safety concerns and that our actions are consistent with our obligations under FERPA. In these circumstances, building administrators should work with their supervisor, the General Counsel's office, and the district's LGBTQ2SIA+ Program Manager, located in the office of Student Success and Health.

## IV. Names And Pronouns

Students of all ages have the right to be addressed by a name and pronouns that correspond to their gender identity. Regardless of whether a transgender, nonbinary, or gender expansive student has legally changed their name or gender marker, students and staff must always use the pronoun and name with which the student identifies or requests. Misgendering can cause severe psychological harm and jeopardize a student's safety at school.

   a. Students of all ages have the right to be addressed by a name and pronouns that align with their gender expression.

   b. The District will not require caregiver/guardian consent before honoring the student's self-reported gender identity, asserted name, and gender expression.

   c. Examining your own gendered language is essential to avoid misgendering students. Ask students and staff what pronouns they use; don't assume.

      i. Staff members and students must use students' asserted pronouns.

      ii. It is not permissible for someone to continue to use the wrong pronoun once they have been made aware of the student's pronouns.

      iii. Refusal to use a student's pronouns may result in disciplinary action.

   d. The District can provide education and/or resources to a student, their caregiver/guardian, other supportive adults, and PPS staff on ways to affirm students' identities and create affirming spaces.

      i. At a minimum, school counselors, social workers, school psychologists, and front office personnel must have the Gender Identity Support Guide available where students and caregivers can freely access it.

         1. This guide currently contains: Meeting Request form, School Support Plan, Student Name/Gender Marker change form, and Athletic Support.

      ii. Current resources are freely available on the PPS LGBTQ2SIA+ website

## V. Student Information System

Portland Public Schools follows the Oregon Department of Education's processes for registration and records information regarding a transgender or



4.30.061-AD

nonbinary student's first name and gender marker. Furthermore, additional processes have been created as the Student Information System's capabilities expand to meet the needs of transgender, nonbinary, and gender expansive students.

   a. Caregivers may register their student(s) using their asserted name and gender marker.

      i. Students do not need to have medical recognition or documentation to change their legal name field, preferred name field, or gender marker field in the SIS.

      ii. They should contact their school's front office personnel for assistance with utilizing the Protected Information screen if they wish to utilize this screen in the SIS.

         1. Only secretaries and school administrators have access to this screen.

         2. It cannot be seen or changed by any other school personnel when they pull a student's information.

         3. Only the asserted information will show when the student's information is pulled up using the SIS.

   b. Caregivers may also update a student's legal name field, gender marker, and/or preferred name field to reflect the asserted identity of their student(s) during the Yearly Verification process using ParentVue.

   c. A student may change their first name, gender marker, and/or the name in the "preferred name" field in the SIS by submitting the Name Change/Gender Marker Change form to the front office staff in their school.

      i. Students may elect to submit this form with the assistance of a trusted adult or on their own. In addition, students may elect to utilize the Protected Information screen during this process.

      ii. This form does not require a caregiver signature in keeping with ODE guidance.

         1. Requested changes must be made within 24 hours of form submission.

         2. The form is to be kept in a confidential file on-site.

         3. Do not upload this form to the student's cumulative file or the SIS.

      iii. The legal first name of the student will be replaced with the student's asserted name. The legal first name may be moved to the middle name field but is not required.

      iv. A student and/or caregiver may elect to update their gender marker to any of the available options in the SIS that match or are the most closely aligned to the student's gender identity.

      v. A student and/or caregiver may elect to enter an asserted name into the "preferred name" field instead of the legal first name field if they prefer.

   d. For students who have legally changed their name and/or gender marker in

 4.30.061-AD

court, presentation of the document(s) will automatically be registered by the school. In all instances of an update to the SIS, the student will retain the same SSID number.

e. All reports, where possible, must use the preferred name field (marked "nickname" in the drop down menu) when setting the parameters for the report to ensure all students are listed by their asserted name.

f. Students may select a pronoun in the SIS
   i. Limitations of the field require all staff to continue to ask students for their pronouns.
      1. Many students use mixed pronouns (e.g. they/he, she/he/they, it/them) and neo/xeno pronouns which are not included in the dropdown list.
      2. Staff may not use this technological limitation as an excuse for misgendering students.
         a. They will use all SIS capabilities available to them (seating chart, pronoun field, etc), in addition to rapport building and regularly asking students for their pronouns, to ensure they are using the correct pronouns for students at all times.
   ii. Limitations of the pronoun field also require all school staff to check with students before using any listed pronouns when calling home.
      1. Some trans, nonbinary, and/or gender expansive students do not come from affirming homes. Verifying pronouns before calling home will decrease the chance of outing a student before they are ready.

g. When a student changes their name and/or pronouns in the SIS, student ID cards and all school media (e.g. yearbooks, school/class photos, school newspapers, etc) should reflect the asserted name and, where applicable, asserted pronouns.

## VI. Restrooms and Locker rooms

Portland Public Schools' Restroom Equity Plan guides the process for new builds and remodels to ensure transgender and gender expansive students have access to restrooms and locker rooms that align with their gender identity. All new builds will incorporate adequate gender neutral restroom and locker room designs to meet the increasing needs of transgender, non binary, and gender expansive students of Portland Public Schools.

a. Before plans for new builds are finalized, planning teams must consult with the Program Manager for LGBTQ2SIA+ Supports and other PPS staff who can properly advocate for the needs of transgender, nonbinary, and gender expansive students. This can include but is not limited to:
   i. Student Success and Health department staff, Health and Adapted Physical Education department staff, Title IX staff.

b. With regards to restroom usage, the school has a duty to provide equal



4.30.061-AD

access to education, ensure student safety, and maximize social integration while minimizing stigmatization of the student.

c. Students shall have access to a restroom that corresponds to their gender identity and/or have access to an all gender restroom without the need for prior approval.

    i. Students have a right to confidentiality regarding their trans, nonbinary, and/or gender expansive identity. Requiring students to get approval for restroom use, regardless of restroom designation, would require a student to out themselves.

d. Prohibiting a student from accessing the restroom that aligns with their gender identity is not allowed.

    i. In the case of genderfluid students, they will be allowed to use gendered restroom spaces as their understanding of their identity fluctuates.

    ii. Students in the process of socially transitioning may transition from the use of one gendered restroom to another at the speed they are comfortable with.

        1. It is recommended, though not required, that students utilize the Gender Identity Support Guide's support plan to ensure they have what is needed to complete this transition from one space to another safely.

e. If there is a need or desire for increased privacy and safety, regardless of the underlying purpose or cause, any student may be provided access to a reasonable alternative such as a single stall, all gender restroom.

    i. The option of a single stall restroom should not be forced upon or presented as the *only* option to transgender, nonbinary or gender expansive students. These students must have the same access to safe restrooms as their peers.

    ii. School communities should work to create a school culture that encourages binary students (those who identify as male and female) to use gendered restroom spaces as often as possible.

        1. This will ensure gender expansive students have access to the limited number of single stall, all gender restrooms in the buildings when needed.

    iii. Single stall, all gender restrooms shall be available off a hallway or corridor, without barriers to use such as time-limited access, required keys, prior approval or long distances to travel.

f. Buildings may not lock the all gender restrooms as a response to student behavior (e.g. drug use or sexual activity).

g. A student will not be required to use a locker room that is incongruent with the student's gender identity.

    i. Any student who has a need or desire for increased privacy,



**4.30.061-AD**                                                                 **Page 6 of 10**

regardless of the underlying reasons, should be provided with a reasonable alternative changing area such as the option to use a private area (e.g., a nearby restroom stall with a door, or an area separated by a curtain) or a separate changing schedule (e.g., using a locker room before or after other students).

    ii.   Alternative changing spaces shall be available without barriers to use such as time-limited access, required keys or long-distances to travel.

h.  The Oregon Physical Education standards can be met without requiring students to "dress down" for PE (e.g., change into a PE uniform).

    i.   Transgender and gender expansive students may elect to skip changing for PE if doing so alleviates any potential harm caused by being in a gendered space.

    ii.   Students **may not** be penalized (e.g., graded down, required to sit out, etc.) for not dressing down so long as they are wearing appropriate footwear and are actively engaged in the class.

## VII. Athletics & School Activities Participation

Schools should follow the most current governing handbooks and toolkits available to ensure all transgender and gender expansive students have full and affirming access to the sports and activities of their choosing.

a.  Staff supporting sports and activities under OSAA should review the OSAA Gender Diversity Toolkit and handbooks for their sport and/or activity.

b.  Athletic Directors, coaches, and other school staff who support athletics and activities should participate in available PPS and/or OSAA trainings on increasing access to and creating affirming sports and activities spaces for gender expansive students.

c.  Transgender, nonbinary, or gender expansive students participating in any sport or activity may request a meeting to complete the School Support Plan and Athletic Support Plan (found in the Gender Identity Support Guide) to ensure they have what they need to fully participate as their authentic selves.

## VIII. Overnight School Trips

Students should be allowed use of an overnight facility that corresponds with their gender identity. Transgender, nonbinary and gender expansive students must be consulted early on in the planning process to address any questions or concerns the student may have, including any needs for privacy in terms of dressing, showering, etc. The caregiver/guardian should be consulted as well, unless there are concerns for student safety in doing so.

a.  Best practice is to make available a gender-inclusive accommodation that is presented as an option for any student who feels more comfortable with that option.

    i.   Schools should work with the student, family, principal's supervisor,



and, as necessary, the General Counsel's Office in devising a plan based on the particular circumstances of the trip.

    ii.   In no case should a transgender, nonbinary, or gender expansive student be denied the right to participate in an overnight field trip because of the student's transgender, nonbinary, or gender expansive status.

## IX. Dress Code

Please reference 4.30.013-AD Dress Code to read the code in full.

a. Students have the right to dress in accordance with their gender identity.

b. School staff shall affirm a student's right to dress in accordance with their gender identity.

## X. Student Safety

Transgender and nonbinary students are often targeted with physical violence and experience a hostile school environment at a higher rate than their peers. The Title IX of the Education Amendments Act prohibits discrimination and harassment based on sex. This includes all forms of sexual harassment, sexual assault and discrimination based on LGBTQ2SIA+ status. Additionally, Oregon law and Portland Public Schools Anti-Harassment Policy prohibit harassment, intimidation, bullying or cyberbullying. See also the 4.30.072-AD Title IX Student to Student Sex-Based Discrimination and Harassment. School District employees must report acts of harassment, intimidation, bullying, or cyberbullying.

a. Students who bully, harass, or otherwise discriminate against other students based on any protected status may be subject to school discipline in accordance with PPS discipline policies, administrative directives, and the Student Rights, Responsibilities, and Discipline Handbook.

    i.   Students, caregivers, and/or District employees should report any anti-LGBTQ2SIA+ incidents to their building Title IX Coordinator.

    ii.   School and District administration should promptly respond with actions that immediately stop the behavior.

    iii.   The Coordinator should immediately consult with the Program Manager for LGBTQ2SIA+ Supports and their building's Conduct Coordinator to assist with determining and enforcing appropriate corrective actions.

        1. This consultation will include recommendations for how to proceed informed by the discipline matrix and all other applicable PPS policies and administrative directives.

        2. Consultation may also result in a recommendation to consult with a Confidential Advocate and/or file a Title IX report if the behavior in question is severe in nature or is



4.30.061-AD

shown to be persistent and pervasive.

    iv. The building Title IX Coordinator should document the incident and related interventions which should include:

        1. Remedies used to correct the effects of the anti-LGBTQ2SIA+ behavior on the targeted student and other students;

        2. Implementing supportive measures as required by Title IX, and;

        3. Monitoring to ensure that the behavior does not recur.

b. Students, caregivers, and/or District employees may file a Title IX complaint using the online complaint form or by speaking with the building-based Title IX coordinator. The form and list of building-based coordinators for each school can be found on the Title IX website.

    i. It is important to note: students may not wish to use the reporting system due to not being out to peers, staff, and/or caregivers.

    ii. School and District staff should make every effort to center the student's need to maintain confidentiality regarding their sexual orientation and/or gender identity during the reporting.

## XI. Curriculum And Instruction

a. The Office of Teaching and Learning shall be proactive in decreasing anti-LGBTQ language, feelings, behaviors, and bullying by:

    i. Promoting positive images of LGBTQ2SIA+ individuals;

    ii. Making available age appropriate LGBTQ2SIA+ inclusive instructional materials and books for elementary and secondary schools;

    iii. Requiring that newly-adopted and recommended instructional materials include significant events, societal contributions, and/or representations of LGBTQ2SIA+ individuals;

    iv. Offering LGBTQ2SIA+ awareness training for staff, community based partners, and volunteers;

    v. Reminding staff of their duty to ensure that all students are safe and affirmed in our school communities, and to create a school culture that both prevents and proactively intervenes with acts of name-calling (such as racist, sexist, transphobic, and homophobic remarks), bias, harassment, or bullying that they observe, including, but not limited to LGBTQ2SIA+ biased language and bullying; and

    vi. Deny all requests for prior notification and/or student exemptions from LGBTQ2SIA+ affirming lessons.

b. The Program Manager for LGBTQ2SIA+ Supports will provide skill building opportunities in Leadership/Teaching Institutes at August in-service

c. Create genuine opportunities for allyship for non-queer staff



4.30.061-AD

## XII. Training and Professional Development

In order to ensure that transgender, nonbinary and gender expansive students are included in all school activities and allowed to participate in the full school community, it is imperative that all school and district staff members participate in annual professional development specific to the needs and rights of transgender, nonbinary and gender expansive students. The content of training and professional development shall include but not be limited to:

a. Terms, concepts, and current developmental understandings of gender identity, gender expression, and gender diversity in children and adolescents;
b. Developmentally appropriate strategies for communication with students and caregivers about issues related to gender identity and gender expression;
c. Developmentally appropriate strategies for preventing and intervening in bullying incidents, including cyberbullying;
d. Classroom management practices, curriculum, and resources that educators can integrate into their classrooms to help foster a more gender-inclusive environment for all students;
    i.  List of examples of things people need to know to do/not do, including:
        1. Pulling a student to the side to ask vs. asking in front of class;
        2. How to apologize and move on when a staff member misgenders or deadnames a student; and
        3. How to repair harms experienced by LGBTQ2SIA+ students caused by a staff member's ignorance or lack of allyship.
e. Create and support an informal mechanism for students to comment on the building culture to decrease the harm experienced by LGBTQ2SIA+ students as a result of lack of knowledge or others' personal beliefs.


Approved 1/3/18


Revised 5/2019; 10/2021; 9/2022 6/2023





Edits as of 8/2022 (Use 'suggesting' to add text)¶

## Administrative Directive 4.30.061-AD ¶
¶
¶

## Transgender, Nonbinary and Gender ¶ ~~Diverse~~Expansive Students

## I. ~~OVERVIEW – STUDENT FOCUSED PROCEDURES~~Overview – Student Focused Procedures

It is the District's goal to create a safe and welcoming environment for our students and ▪staff, free of transphobia and homophobia. This directive is meant to identify procedures ▪and provide guidance to district and school staff so that transgender, nonbinary and ▪gender ~~diverse~~expansive students are fully included in ~~the~~their school ~~community~~communities and have the supports necessary ~~supports~~to actively participate in all school activities free of discrimination. When creating a plan of ▪ action or making decisions around how best to support a student, within the parameters ▪ of this directive, every effort should be made to include the student(s) and families ▪ themselves.

The District is continually improving and refining our efforts toward greater inclusion for LGBTQ2SIA+ and affirmation of staff and students. This requires an unwavering commitment to a systematic shift in paradigms to increase the understanding of sexual and gender diversity. Such a shift requires appropriate communication, professional development, collaboration with our labor partners, and a commitment from the Board, District staff, students, and families.

This directive furthers the Board of Education's Non-Discrimination Policy▪ 1.80.020-P which states: "The District is committed to equal opportunity and nondiscrimination in all its educational and employment activities. The District prohibits▪ discrimination based on race; national or ethnic origin; color; sex; religion; age; sexual orientation; gender expression or identity; pregnancy; marital status; familial status; economic status or source of income; mental or physical disability or perceived disability; or military service." ▪This directive also furthers the Board of Education's Anti-Harassment Policy 4.30.060-P, which prohibits harassment, discrimination, bullying and retaliation based on a person's protected class.

~~This directive also furthers the Board of Education's Anti-Harassment Policy 4.30.060-P, which prohibits harassment, discrimination, bullying and retaliation based on a person's protected class.~~

## II. ~~DEFINITIONS~~Definitions



4.30.061-AD                                                        Page 1 of 10

The definitions below adopt commonly Please refer to the LGBTQ2SIA+ Supports Glossary to learn more about accepted terminology for important concepts relating to gender expression and identity. As This glossary will be updated regularly as definitions evolve or new words come into use.

### III. Gender Identification Confidentiality

over time, Families are not required to disclose their student's sex assigned at birth to any school representative. It is their right to maintain this AD will be updated as appropriate. confidential medical information. Additionally, the Family Education Rights Privacy Act (FERPA) applies to all aspects of a student's identity, including gender identity. Under FERPA, generally only those

a) "LGBTQ2SIA+" is a term that encompasses multiple gender identities and sexual orientations including Lesbian, Gay, Bisexual, Transgender, Queer, Two-Spirit, Intersex, and Asexual. The plus sign ("+") recognizes that there are myriad ways to describe gender identities and sexual orientations. It is also important to recognize that the challenges and barriers for students who identify as lesbian, gay, bisexual, queer can be different from the challenges and barriers faced by students with diverse and/or expansive gender identities and expressions.

b) "Asexual" is a person who does not experience sexual attraction, but could still experience other forms of attraction (e.g. emotional, intellectual).



## Administrative Directive 4.30.061-AD



## Transgender, Nonbinary and Gender Diverse Students

c) "Agender" is a person who does not identify with a specific gender or feels neutral when it comes to their gender identity.

d) "Bisexual" is a person who is attracted to more than one gender. e) "Cisgender" is a person who feels their gender identity and expression align with the sex they were assigned at birth or by society.

f) "Gay" is a person who is attracted to a person of the same gender. g) "Gender diverse" describes people whose gender expression differs from stereotypical expectations, such as "feminine" boys, "masculine" girls, and those who are perceived as androgynous.

h) "Gender expression" is the way a person expresses their gender in ways that make them feel more comfortable and aligned to who they are. Some forms of expression could be clothing, voice, cosmetics, or mannerisms.

i) "Gender fluid" refers to a person whose gender expression and/or identity changes over time across or between different genders or presentations. j) "Gender identity" is a person's deeply held knowledge of their own gender, which can include being female, male, another gender, or no gender. Gender identity is an innate and largely inflexible part of a person's identity. One's gender



~~identity can be the same or different than the gender assigned at birth. The responsibility for determining an individual's gender identity rests with the individual.~~ ¶

~~k) **"Gender nonconforming"** is a person who does not identify with a specific set of traits (behavioral, cultural, community roles) on the male to female spectrum.~~ ¶

~~l) **"Gender transitioning"** is the process of changing one's gender expression, physical body, and/or legal documentation to align with their gender identity. m) **"Intersex"** is an umbrella term for unique variations in reproductive or sex anatomy. Variations may appear in a person's chromosomes, genitals, or internal organs like testes or ovaries. Some intersex traits are identified at birth, while others may not be discovered until puberty or later in life. n) **"Lesbian"** is a female-identified person who is attracted to women. o) **"Misgender"** occurs when a person wrongly assumes a~~ ¶

~~student's gender and uses the wrong pronouns and/or inaccurate gendered language such as "ladies, miss, boys, Mr., etc." while referring to a student or group.~~ ¶

~~p) **"Non-binary/genderqueer"** are terms are often used to describe people whose gender is not exclusively male or female, including those who identify~~ ¶

## Administrative Directive 4.30.061-AD ¶



## ~~Transgender, Nonbinary and Gender~~ ¶ ~~Diverse~~ school employees "determined to have legitimate educational interest" may have access to a student's records or the information contained within those records.

a. The school should work closely with the student and, when indicated, their family in devising a plan to maintain confidentiality and inform school staff on a need-to-know basis. Or, if the student wishes to have other students be aware that they are transgender and/or that they are transitioning, they should be supported in doing so. In either case:

    i. Portland Public Schools utilizes the Gender Identity Support Guide to assist students, their trusted adults, and staff in developing a comprehensive plan to support the unique needs of the student.

        1. Students/caregivers may use the Meeting Request form to begin the process of creating a support plan.

            a. Schools must respond to the request within 10 business days of receipt.

        2. All support plans are iterative and should be revisited at a regular interval and immediately following any major changes for the student.

    ii. Students may include their trusted adult(s) in this process.

~~with a gender other than male or female, as more than one gender, or as no gender.~~

~~q) "**Pronouns**" or set of pronouns that a person identifies with and would like to be called when their proper name is not being used. Examples include "she/her/hers," "he/him/his," ze/hir/hirs," and "they/them/theirs." Some people prefer no pronouns at all, or some combination such as "she/they."~~

~~r) "**Queer**" is a person who does not subscribe to dominant social norms to define their sexual orientation, gender identity, or gender expression. While it is used as a neutral, or even a positive term among many LGBTQ2SIA+ people today, historically "queer" has been used as a derogatory slur. It is sometimes still used as a slur by those who do not identify as part of the community.~~

~~s) "**Sex assigned at birth**" The assignment and classification of people as male, female, intersex, assigned at birth often based on physical anatomy at birth and/or karyotyping.~~

~~t) "**Sexual orientation**" is a person's romantic and/or physical attraction to people of the same and/or another gender, such as being straight, gay, bisexual, or asexual. Transgender and gender nonconforming people may have any sexual orientation.~~

~~u) **Transgender**" or "**Trans**" describes any person whose gender identity does not correspond with the sex assigned at birth. "Trans" also often is used as an umbrella term for those who do not identify as cisgender, and can include nonbinary people.~~

1. ~~v) "**Two-Spirit** " is used within some Indigenous communities, encompassing cultural, spiritual, sexual and gender identity. The term reflects complex Indigenous understandings of gender roles, spirituality, and the long history of sexual and gender diversity in Indigenous cultures. Individual terms and roles for Two-Spirit people are specific to each nation.~~ Trusted adults may be caregivers, teachers, coaches, counselors, social workers, school secretaries, educational assistants, nutritional services employees, custodians, school administrators, the LGBTQ2SIA+ Supports Program Manager, etc. Students may choose to include trusted adults whose roles are not represented by this specific list.

2. It is not required for students to include all these parties in this process.

iii. The school should make every effort to restrict access to the records maintained by the school (birth certificates, etc.) which identify assigned sex, to persons authorized in the plan designed with the student.

b. Student Information System (SIS) reports generated by the school, and that could be seen by students and/or staff who do not have a need to know, should not reveal the "gender marker" field for a student.

i. Classlists, attendance, and report cards should not include the "gender marker" field.



4.30.061-AD

ii.    SIS generated reports should include, where possible, asserted names (preferred name field) and, if available, pronouns for students.

c.   The District and the State of Oregon recommend that all student transcripts be gender neutral and contain no indicator of gender for any student. Schools should suppress gender for all student transcripts, except when a student makes a specific request to show their gender on their transcript.

d.   Diplomas and transcripts for transgender students should be printed in duplicate, one in their legal name and the second in their asserted name.

e.   In some circumstances, our transgender, nonbinary or gender expansive students do not want their caregivers to know about their transgender, nonbinary, or gender expansive status and that they are expressing their asserted gender at school. We must balance our goal of supporting the student with the requirement that we keep caregivers informed when there are safety concerns and that our actions are consistent with our obligations under FERPA. In these circumstances, building administrators should work with their supervisor, the General Counsel's office, and the district's LGBTQ2SIA+ Program Manager, located in the office of Student Success and Health.

**Iv. Names And Pronouns**
Students ¶


**III. NAMES AND PRONOUNS** ¶

a) Students of all ages have the right to be addressed by a name and pronouns that correspond to their gender identity. Regardless of whether a transgender or, nonbinary, or gender expansive student has legally changed their name or gender marker, students and staff shouldmust always use the pronoun and name with which the student identifies or requests. Misgendering can cause severe psychological harm ¶

**Administrative Directive 4.30.061-AD** ¶



**Transgender, Nonbinary and Gender** ¶
**Diverse Students** ¶
and jeopardize a student's safety at school.

a.   i. Students of all ages have the right to be addressed by a name and pronouns that align with their gender expression.

b.   The District will not require caregiver/guardian consent before honoring the student's self-reported gender identity, asserted name, and gender expression.

c.   Examining your own gendered language is essential to avoid misgendering students. Ask students and staff what pronouns they use; don't assume.

   i.    Staff members and students must use students' desiredasserted pronouns.

   ii.   It is not permissible for someone to continue to use the wrong pronoun

4.30.061-AD                                                    Page 5 of 10

once ~~someone has~~they have been ~~made~~ aware of the student's pronouns. ~~For example, if a student has asked to be referenced by the pronouns "They/Them/Theirs," is it incumbent upon staff and students to honor that request.~~

~~ii. School student ID cards and all school media should reflect the name the student identifies with.~~

iii. ~~iii. It is very important not~~Refusal to ~~assume any~~use a student's pronouns~~, but rather~~ may result in disciplinary action.

d. The District can provide education and/or resources to ~~ask all~~a student, their caregiver/guardian, other supportive adults, and PPS staff on ways to affirm students' identities and create affirming spaces.

   i. At a minimum, school counselors, social workers, school psychologists, and front office personnel must have the <u>Gender Identity Support Guide</u> available where students ~~which pronouns they use. Examining your own gendered language is essential to avoid misgendering students.~~ and caregivers can freely access it.

      1. This guide currently contains: Meeting Request form, School Support Plan, Student Name/Gender Marker change form, and Athletic Support.

   ii. Current resources are freely available on the PPS LGBTQ2SIA+ <u>website</u>

## V. ~~b)~~ Student Information System

Portland Public Schools follows the Oregon Department of Education's processes for registration and records information regarding a transgender or nonbinary student's first name and gender~~—~~ marker. Furthermore, additional processes have been created as the Student Information System's capabilities expand to meet the needs of transgender, nonbinary, and gender expansive students.

a. ~~c)~~ Caregivers may register their student(s) using their asserted name and gender marker.

   i. Students do not need to have medical recognition or documentation to change their ~~gender or~~legal name field, preferred name field, or gender marker field in the ~~student~~ SIS.

   ii. They should contact their school's front office personnel for assistance with utilizing the Protected Information screen if they wish to utilize this screen in the SIS.

      1. Only secretaries and school administrators have access to this screen.

      2. It cannot be seen or changed by any other school personnel when they pull a student's information ~~system. However, parent/guardian permission to make a change to their legal name and/or gender in the student~~.

      3. Only the asserted information ~~system is required by law. This is true until the~~will show when the student's information is pulled up



4.30.061-AD

using the SIS.

b. Caregivers may also update a student's legal name field, gender marker, and/or preferred name field to reflect the asserted identity of their student(s) during the Yearly Verification process using ParentVue.

A student ~~turns 18 or is an emancipated minor, at which point the student makes their own educational decisions.~~ ¶

~~c.~~ ~~i. If requested by the student and approved by a parent or legal guardian, students may~~ may change their first name ~~in the student information system.~~ , gender marker, and/or the name in the "preferred name" field in the SIS by submitting the Name Change/Gender Marker Change form to the front office staff in their school.

    i.    Students may elect to submit this form with the assistance of a trusted adult or on their own. In addition, students may elect to utilize the Protected Information screen during this process.

    ii.    This form does not require a caregiver signature in keeping with ODE guidance.

        1. Requested changes must be made within 24 hours of form submission.

        2. The form is to be kept in a confidential file on-site.

        3. Do not upload this form to the student's cumulative file or the SIS.

    iii.    The legal first name of the student ~~can~~will be replaced with the student's ~~preferred~~asserted name ~~and the~~. The legal first name ~~is then~~may be moved to the middle name ~~field~~ but is not required.

    iv.    A student and/or caregiver may elect to update their gender marker to any of the available options in the SIS that match or are the most closely aligned to the student's gender identity.

    v.    A student and/or caregiver may elect to enter an asserted name into the "preferred name" field instead of the legal first name field if they prefer.

d. For students who have legally changed their name and/or gender marker in court, presentation of ~~the name change~~ document(s) will automatically be registered by the school. In all instances of an update to the SIS, the student ~~would~~will retain the same SSID number.

~~ii. If the student does not have parent approval, and/or there is a reason why they do not wish to change the legal first name field, then the student may request that their preferred name be entered in the "preferred name" field.~~ ¶

~~iii. If requested by the student and approved by a parent or legal~~ ¶
~~**Administrative Directive 4.30.061-AD**~~ ¶

~~**Transgender, Nonbinary and Gender**~~ ¶



Page 7 of 10

**Diverse Students ¶**

~~guardian, schools will change a student's gender in the student ¶~~
~~information system. Current options include male, female, or ¶~~
~~nonbinary. A written request for the change is considered ¶~~
~~documentation for this change. ¶~~

e. iv. ~~If the student has chosen to keep their~~ All reports, where possible, must use the preferred name field (marked "nickname" in the drop down menu) when setting the parameters for the report to ensure all students are listed by their asserted name.

f. Students may select a pronoun in the SIS
  i. Limitations of the field require all staff to continue to ask students for their pronouns.
      1. Many students use mixed pronouns (e.g. they/he, she/he/they, it/them) and neo/xeno pronouns which are not included in the dropdown list.
      2. Staff may not use this technological limitation as an excuse for misgendering students.
          a. They will use all SIS capabilities available to them (seating chart, pronoun field, etc), in addition to rapport building and regularly asking students for their pronouns, to ensure they are using the correct pronouns for students at all times.
  ii. Limitations of the pronoun field also require all school staff to check with students before using any listed pronouns when calling home.
      1. Some trans, nonbinary, and/or gender expansive students do not come from affirming homes. Verifying pronouns before calling home will decrease the chance of outing a student before they are ready.

g. When a student changes their name and/or pronouns in the SIS, student ID cards and all school media (e.g. yearbooks, school/class photos, school newspapers, etc) should reflect the asserted name and, where applicable, asserted pronouns.

VI. ~~transgender status confidential from their parents/guardians, or if there is no parent/guardian in agreement with the student's wishes, the school cannot change the official information located in the registration form or student information system. However, school staff should use the name requested by the student in all other areas and aspects of school day. If parents who share custody disagree, school staff should consult with the office of General Counsel. ¶~~

~~IV.~~ **Restrooms and Locker rooms**



4.30.061-AD

Portland Public Schools Restroom Equity Plan guides the process for new builds and remodels to ensure transgender and gender expansive students have access to restrooms and locker rooms that align with their gender identity. All new builds will incorporate adequate gender neutral restroom and locker room designs to meet the increasing needs of transgender, non binary, and gender expansive students of Portland Public Schools.

    a. Before plans for new builds are finalized, planning teams must consult with the Program Manager for LGBTQ2SIA+ Supports and other PPS staff who can properly advocate for the needs of transgender, nonbinary, and gender expansive students. This can include but is not limited to:

        i. Student Success and Health department staff, Health and Adapted Physical Education department staff, Title IX staff.

## ~~Gender Identification Confidentiality~~

    ~~a) The Family Education Rights Privacy Act (FERPA) applies to all aspects of a student's identity, including gender identity. Under FERPA, generally only those school employees "determined to have legitimate educational interest" may have access to a student's records or the information contained within those records.~~

      ~~i. The school should work closely with the student and family in devising a plan to maintain confidentiality and inform school staff on a need-to-know basis. Similarly, if the student wishes to have other students be aware that they are transgender and/or that they are transitioning, they should be supported in doing so. In either case, the school should work closely with the student and family, and involve the school counselor and district departments such as Student Success and Health if they need assistance in devising such a plan.~~

      ~~ii. The school should make every effort to restrict access to the records maintained by the school (birth certificates, etc.) in identifying assigned sex, to persons authorized in the plan designed with the student.~~

      ~~iii. Student information system reports generated by the school, and that could be seen by students and/or staff who do not have a need to know, should not reveal a student's gender. The default for the present student information system reports such as class lists for substitutes does not~~



## ~~Administrative Directive 4.30.061-AD~~

## ~~Transgender, Nonbinary and Gender Diverse Students~~

    ~~show gender and should continue not revealing gender. This helps maintain confidentiality.~~

    ~~iv. The District and the State of Oregon recommend that all student transcripts be gender neutral and contain no indicator of gender for any student.~~



~~Currently, student transcripts default to showing gender, however, each time a single transcript or batch of transcripts is run, the school has the option of suppressing gender. The district recommends that the option to suppress gender be used for all student transcripts, except in cases where a student makes a specific request to show their gender on their transcript.~~

iii. ~~v. In some circumstances, our transgender, nonbinary or gender diverse students do not want their parents to know about their transgender or nonbinary status and that they are expressing their affirmed gender at school. We must balance our goal of supporting the student with the requirement that we keep parents informed when there are safety concerns. In these circumstances, building administrators should work with their supervisor, the General Counsel's office, and the office of Student Success and Health.~~

## ~~V.~~ Restroom and Locker Room Usage

a) With regards to restroom ~~and locker room~~ usage, the school has a duty to

b. provide equal access to education, ensure student safety, and maximize social integration while minimizing stigmatization of the student.

c. ~~b)~~ Students shall have access to a restroom that corresponds to their gender ~~identity~~ identity and/or have access to an all gender restroom without the need for prior approval.

   i. Students have a right to confidentiality regarding their trans, nonbinary, and/or gender expansive identity. Requiring students to get approval for restroom use, regardless of restroom designation, would require a student to out themselves.

d. Prohibiting a student from accessing the ~~restrooms~~ restroom that ~~correspond~~ aligns with ~~a student's~~ their gender identity is not allowed.

   i. ~~i.~~ In the case of genderfluid students, they will be allowed to use gendered restroom spaces as their understanding of their identity fluctuates.

   ii. Students in the process of socially transitioning may transition from the use of one gendered restroom to another at the speed they are comfortable with.

      1. It is recommended, though not required, that students utilize the Gender Identity Support Guide's support plan to ensure they have what is needed to complete this transition from one space to another safely.

         If there is a need or desire for increased privacy and safety, regardless of the underlying purpose or cause, any student may be provided access to a reasonable alternative such



4.30.061-AD

e.  as a single stall, all gender restroom.

    i.  The option of a single stall restroom should not be forced ¶
       upon or presented as the ***only*** option to transgender, ¶

i.  nonbinary or gender ~~diverse students.~~ expansive students.
These students must have the same access to safe restrooms
as their peers.

ii.  ~~ii. All gender,~~ School communities should work to create a
school culture that encourages binary students (those who
identify as male and female) to use gendered restroom spaces
as often as possible.

    1.  This will ensure gender expansive students have access
to the limited number of single stall, all gender restrooms
in the buildings when needed.

      Single stall, all gender restrooms shall be available off a ¶
      hallway or corridor, without barriers to use such as time-¶



~~**Administrative Directive 4.30.061-AD**~~ ¶

~~**Transgender, Nonbinary and Gender**~~ ¶
~~**Diverse Students**~~ ¶

      limited access, required keys, prior approval or long ¶
iii.  distances to travel.

f.  ~~e)~~ Buildings may not lock the all gender restrooms as a response to
student behavior (e.g. drug use or sexual activity).

g.  A student will not be required to use a locker room that is incongruent
with the student's gender identity. ~~The school should work with the
student to ensure the student has privacy, if so desired, within the
locker room. i.~~

    Any student who has a need or desire for increased ¶
      privacy, regardless of the underlying reasons, should be ¶
      provided with a reasonable alternative changing area such as ¶
      the option to use a private area (e.g., a nearby restroom stall ¶
      with a door, or an area separated by a curtain) or ~~with~~ a ¶
      separate changing schedule (e.g., using ~~the~~ a locker room ~~that~~ ¶
i.  ~~corresponds to their gender identity~~ before or after other
students).

    ~~students).~~ ¶
    ii. Alternative changing spaces shall be available without ¶
      barriers to use such as time-limited access, required keys or ¶
ii.  long-distances to travel.

h.  The Oregon Physical Education standards can be met without
requiring students to "dress down" for PE (e.g., change into a PE
uniform).

 **4.30.061-AD**

i.   Transgender and gender expansive students may elect to skip changing for PE if doing so alleviates any potential harm caused by being in a gendered space.

ii.  Students **may not** be penalized (e.g., graded down, required to sit out, etc.) for not dressing down so long as they are wearing appropriate footwear and are actively engaged in the class.

### VII. Athletics & School Activities Participation

Schools should follow the most current governing handbooks and toolkits available to ensure all transgender and gender expansive students have full and affirming access to the sports and activities of their choosing.

a.  Staff supporting sports and activities under OSAA should review the OSAA Gender Diversity Toolkit and handbooks for their sport and/or activity.

b.  Athletic Directors, coaches, and other school staff who support athletics and activities should participate in available PPS and/or OSAA trainings on increasing access to and creating affirming sports and activities spaces for gender expansive students.

c.  Transgender, nonbinary, or gender expansive students participating in any sport or activity may request a meeting to complete the School Support Plan and Athletic Support Plan (found in the Gender Identity Support Guide) to ensure they have what they need to fully participate as their authentic selves.

### VIII. ~~VI.~~ Overnight School Trips

~~a)~~ Students should be allowed use of an overnight facility that corresponds with their gender identity. Transgender, nonbinary and gender ~~diverse~~ expansive students ~~should~~must be consulted early on in the planning process to address any questions or concerns the student ~~might~~may have, including any needs for privacy in terms of dressing, showering, etc. The

~~parent~~caregiver/guardian should be consulted as well, unless there are concerns for student safety in doing so.

i.  Best practice is to make available a gender-inclusive accommodation that is presented as an option for any student,

a.  ~~with parent/guardian permission,~~ who feels more comfortable with that option.

~~with that option.~~

ii.  Schools should work with the student, family, principal's supervisor, and, as necessary, the General Counsel's Office in devising a plan based on the particular circumstances of the

i.  trip.

iii.  In no case should a transgender, nonbinary, or gender ~~diverse~~expansive  student be denied the right to participate in an overnight field

~~Administrative Directive 4.30.061-AD~~



~~Transgender, Nonbinary and Gender Diverse Students~~

  ii. trip because of the student's transgender, nonbinary, or gender expansive status.
     ~~diverse status.~~

## IX. ~~VII.~~ Dress Code

~~a)~~ Please reference 4.30.013-AD Dress Code to read the code in full.
  a. Students have the right to dress in accordance with their gender -identity.
  b. ~~b)~~School staff shall affirm a student's right to dress in accordance with their gender identity.

~~VIII~~

## X. Student Safety

  Transgender and nonbinary students are often targeted with physical violence and experience a hostile school environment at a higher rate than their peers. The Title IX of the Education Amendments Act prohibits discrimination and harassment based on sex. This includes all forms of sexual harassment, sexual assault and discrimination based on LGBTQ2SIA+ status. Additionally, Oregon law and Portland Public Schools ~~Anti-Harassment Policy~~Anti-Harassment Policy prohibit harassment, intimidation, bullying or cyberbullying. ~~School District employees must~~See also the 4.30.072-AD Title IX Student to Student Sex-Based Discrimination and Harassment. School District employees must report acts of harassment, intimidation, bullying, or cyberbullying. ~~Transgender and nonbinary students are often targeted with physical violence and experience a hostile school environment at a higher rate than their peers. Along with District employees, parents and students should report any~~

  a. Students who bully, harass, or otherwise discriminate against other students based on any protected status may be subject to school discipline in accordance with PPS discipline policies, administrative directives, and the Student Rights, Responsibilities, and Discipline Handbook.
    i. Students, caregivers, and/or District employees should report any anti-LGBTQ2SIA+ incidents to ~~the School Compliance Officer and the~~their building Title IX ~~Director.~~Coordinator.
    ii. School and District administration should promptly respond with actions that ~~include, but are not limited to:~~ immediately stop the behavior.
  ~~a) Intervening to~~ The Coordinator should immediately ~~stop the behavior;~~
    iii. ~~b) Investigating~~consult with the Program Manager for LGBTQ2SIA+ Supports and ~~documenting the incident; Determining~~their building's Conduct Coordinator to assist with determining and enforcing -appropriate corrective actions~~ within the school's area of responsibility; c) Remedying.~~
      1. This consultation will include recommendations for how to



4.30.061-AD

proceed informed by the discipline matrix and all other applicable PPS policies and administrative directives.
2. Consultation may also result in a recommendation to consult with a Confidential Advocate and/or file a Title IX report if the behavior in question is severe in nature or is shown to be persistent and pervasive.

iv. The building Title IX Coordinator should document the incident and related interventions which should include:
   1. Remedies used to correct the effects of ~~such~~ the anti-LGBTQ2SIA+ behavior on the targeted student and other ·students; ~~and~~
   2. Implementing supportive measures as required by Title IX, and;
   3. Monitoring to ensure that the behavior does not recur.
   4. ~~d) Monitoring to ensure that the behavior does not recur. ¶~~

~~Please see the Administrative Directive on Harassment, Sexual Violence, and Teen Dating Violence Procedures and Prevention - Students 4.30.071-AD. ¶~~

b. ~~IX.~~ Students, caregivers, and/or District employees may file a Title IX complaint using the online complaint form or by speaking with the building-based Title IX coordinator. The form and list of building-based coordinators for each school can be found on the Title IX website.
   i. It is important to note: students may not wish to use the reporting system due to not being out to peers, staff, and/or caregivers.
   ii. School and District staff should make every effort to center the student's need to maintain confidentiality regarding their sexual orientation and/or gender identity during the reporting.

## XI. Curriculum And Instruction

a. The Office of Teaching and Learning shall be proactive in decreasing anti-LGBTQ language, feelings, behaviors, and bullying by:
   i. Promoting positive images of LGBTQ2SIA+ individuals;
   ii. Making available age appropriate LGBTQ2SIA+ inclusive instructional materials and books for elementary and secondary schools;
   iii. Requiring that newly-adopted and recommended instructional materials include significant events, societal contributions, and/or representations of LGBTQ2SIA+ individuals;
   iv. Offering LGBTQ2SIA+ awareness training for staff, community based partners, and volunteers;
   v. Reminding staff of their duty to ensure that all students are safe and affirmed in our school communities, and to create a school culture that both prevents and proactively intervenes with acts of name-calling (such as racist, sexist, transphobic, and homophobic remarks), bias, harassment, or bullying that they observe, including, but not limited to LGBTQ2SIA+ biased language and bullying; and
   vi. Deny all requests for prior notification and/or student exemptions from



LGBTQ2SIA+ affirming lessons.

   b.  The Program Manager for LGBTQ2SIA+ Supports will provide skill building opportunities in Leadership/Teaching Institutes at August in-service

   c.  Create genuine opportunities for allyship for non-queer staff

## XII. Training and Professional Development

In order to ensure that transgender, nonbinary and gender ~~diverse~~expansive students are ~included in all school activities and allowed to participate in the full school community, it~ is imperative that all school and district staff members participate in annual professional ~development specific to the needs and rights of transgender, nonbinary and gender ~~diverse~~expansive students. The content of training and professional development shall include but not be limited to:



~~Administrative Directive 4.30.061-AD~~ ¶



~~Transgender, Nonbinary and Gender~~ ¶
~~Diverse Students~~ ¶

~~not be limited to:~~ ¶

   ~~a.~~ ~~a)~~ Terms, concepts, and current developmental understandings of gender identity, ~gender expression, and gender diversity in children and adolescents;~
   ~~b)~~

   b.  Developmentally appropriate strategies for communication with students and ~ ~~parents~~caregivers about issues related to gender identity and gender expression; ~~c)~~

   c.  Developmentally appropriate strategies for preventing and intervening in bullying incidents, including cyberbullying;~

   d.  ~~d)~~ Classroom management practices, curriculum, and resources that educators can~ integrate into their classrooms to help foster a more gender-inclusive environment for all students~.~;

       i.  List of examples of things people need to know to do/not do, including:

           1.  Pulling a student to the side to ask vs. asking in front of class;

           2.  How to apologize and move on when a staff member misgenders or deadnames a student; and

           3.  How to repair harms experienced by LGBTQ2SIA+ students caused by a staff member's ignorance or lack of allyship.

   e.  Create and support an informal mechanism for students to comment on the building culture to decrease the harm experienced by LGBTQ2SIA+ students as a result of lack of knowledge or others' personal beliefs.

Approved 1/3/18

Revised 5/2019; 10/2021¶

; 9/2022



4.30.061-AD